STATE OF ILLINOIS *v.* ILLINOIS CENT. R. CO. CITY OF CHICAGO *v.*
SAME. UNITED STATES *v.* SAME.

*(Circuit Court, N. D. Illinois.* February 23, 1888.)

1. PUBLIC LANDS—MILITARY SITES—SALE—ACT OF MARCH 3, 1819—DELEGATION
OF POWER.
Under act Cong. March 3, 1819, authorizing the secretary of war to cause to
be sold certain military sites, such sale could be made through an agent spe-
cially appointed for that purpose, and acting under a power of attorney.

2. SAME—SUBDIVISION INTO BLOCKS AND LOTS.
And if in making a sale, under such act, of lands within the limits of, or
near to, a municipal corporation, a subdivision of the tract into blocks, lots,
and streets would be most beneficial to the government, it was the duty of the
secretary of war to adopt that method of selling the tract.

3. SAME—DEDICATION—TITLE TO STREETS.
When Fort Dearborn reservation, near the mouth of Chicago river, was sub-
divided by the agent of the secretary of war, proceeding under the act of con-
gress of March 3, 1819, into lots, and they were sold with reference to the map
or plat of such subdivision, and it was no longer used as a military site or for
any purpose connected with the exercise of the powers of the general govern-
ment, all the lands embraced within its limits ceased to be a part of the na-
tional domain. The title to the specific lots passed to those who purchased
them, while jurisdiction over the streets and open grounds dedicated to pub-
lic use passed from the United States; the title to, and immediate possession
and control of, such streets and grounds vesting in the local government—
that is, in the municipal corporation of Chicago—as a public agency of the
state for the purposes for which such dedication was made.

4. RIPARIAN RIGHTS — MUNICIPAL CORPORATIONS — POWERS — DELEGATION TO
RAILROAD.
The city of Chicago, as riparian owner of ground on the shore of Lake Mich-
igan, having, by the provisions of its charter, to maintain wharves and slips
at the end of streets, and to maintain a breakwater to protect the shore from
the encroachment of the lake, could delegate the power to erect such break-
water to a railroad company as consideration for allowing the road to enter
the city; and upon the erection of such breakwater, and the filling in of the
space between the breakwater and the shore-line, the land thus reclaimed be-
longs to the city. BLODGETT, J., dissenting.

5. SAME.
In the absence of any legislative or governmental direction as to the man-
ner of the occupancy of the bed of Lake Michigan within the state of Illinois,
the Illinois Central Railroad Company, as the riparian owner of the water-
lots in the city of Chicago north of Randolph street, and south of Park row,
had the right, by virtue of such ownership, and as part of its purchase of such
lots, to connect the shore-line by artificial constructions with outside waters
that were navigable in fact; although the exercise of that right is at all times
subject to such regulations—at least, those not amounting to prohibition—as
the state may establish.

6. SAME—POWER OF STATE OVER RIPARIAN OWNERS.
The state of Illinois has the power, by legislation, to prescribe the lines
in the harbor of Chicago beyond which piers, docks, wharves, and other
structures—other than those erected under the authority, express or implied,
of the general government—may not be built by riparian owners in the wa-
ters of the harbor that are navigable in fact.

7 SAME—RAILROAD COMPANIES—CHARTERS AND FRANCHISES
The charter of the Illinois Central Railroad Company granted it the right
to take and use all such lands and waters belonging to the state as were nec-
essary to the construction and complete operation of the road, provided such
use did not interrupt navigation of the waters. *Held* that, upon the consent
from the city of Chicago to enter its limits, the company had the right to erect
piers and breakwaters, and fill in the shallow waters of Lake Michigan within

such city limits, and use the ground thus made for its road-bed and other purposes, provided such piers and breakwaters did not interrupt the navigation of the lake.

8. STATUTES—ENACTMENT—FAILURE OF JOURNAL TO SHOW COMPLIANCE WITH CONSTITUTIONAL PROVISION.

Under the provision of Const. Ill. 1848, art. 3, § 23, that all legislative acts must be read on three different days in each house, it is not necessary to the validity of an act that the journal of either house should show affirmatively that such act was read three times.

9. SAME—AMENDMENT OF TITLE.

Where the original title of an act upon its introduction into the legislature contained superfluous words, and after its passage the title was changed to express truly the subject of the act, such superfluity in the original title will not affect the validity of the act.

10. CONSTITUTIONAL LAW—LOCAL AND SPECIAL LAWS.

An act public in its nature, and in which the people of the whole state have an interest, but which specially concerns the property and rights of a portion of the people of the state, is a local act, within the meaning of Const. Ill. 1848, art. 3, § 23, relating to the title of private or local acts.

11. SAME—TITLES OF LAWS.

Act Ill. April 16, 1869, entitled "An act in relation to a portion of the submerged lands and Lake Park grounds lying on and adjacent to the shore of Lake Michigan on the eastern frontage of the city of Chicago," contained provisions giving the city the fee to certain partially submerged lands, with authority to sell; also provisions giving the fee to certain other submerged lands to a railroad company, with the right to maintain docks and wharves. *Held* that, the general subject of the act being the disposal of lands on and adjacent to the shore of Lake Michigan on the eastern frontage of Chicago, the subject was sufficiently expressed in the title, within the meaning of Const. Ill. 1848, art. 3, § 23, providing that all local laws must contain but one subject, which must be expressed in the title.

12. SAME—LEGISLATIVE GRANTS—SEAL OF STATE.

The provisions of Const. Ill. 1848, art. 4, § 25, that all grants shall be sealed with the great seal of the state, signed by the governor, and countersigned by the secretary of state, do not operate to render void a grant of lands by legislative enactment.

13. SAME—CORPORATIONS—CREATION BY SPECIAL LAW—GRANT OF SPECIAL PRIVILEGE TO EXISTING CORPORATION.

Const. Ill. 1870, art. 11, §§ 1, 2, provide that no corporation shall be created, or its power enlarged, by special laws, and that all the existing charters or grants of special or exclusive privileges under which organization shall not have taken place, or which shall not have been in operation within 10 days of the time the constitution took effect, should have no validity. *Held*, that the sections cited referred only to corporations which were then unorganized, or were not in operation as corporations, and should not be construed to take away any special or exclusive privileges granted to corporations organized and in actual operation.

14. SAME—REPEALING OBLIGATION TO PAY MONEY INTO TREASURY.

Act Ill. April 16, 1869, granted to the defendant railroad certain submerged lands, upon condition that defendant pay into the state treasury a per centum of the gross earnings of the road. *Held*, that act Ill. April 15, 1873, repealing such grant, is not repugnant to the separate section of the constitution of Illinois providing that no contract, obligation or liability of defendant to pay money into the state treasury, nor any lien of the state upon, or right to tax the property of, defendant, under the defendant's charter of 1851, shall be released, suspended, diminished, or impaired.

15. SAME—CONFIRMATION OF TITLE—PRIOR ACTS—REVOCATION.

Act Ill. April 16, 1869, confirmed the right of defendant railroad company, under the grant in its charter, and under and by virtue of its appropriation, occupancy, use, and control, and the riparian ownership incident thereto, in and to certain lands. *Held*, that the confirmation, covering all that had been done by defendant in relation to such lands prior to the date of the act, was equivalent to an original authority so to do, and such confirmation could not be revoked by subsequent enactment.

16. Public Lands—Grant by State—Construction of Grant.

Act Ill. April 16, 1869, granted to the defendant certain submerged lands in the harbor of Chicago in fee, with a proviso that defendant should not have power to alienate such lands, and that the gross receipts from the use, profits, and lease of the lands, or improvements thereon should be a part of the gross receipts of the company for the purposes of taxation. It was also provided that the harbor should not be obstructed, or the right of navigation impaired, and that the legislature might regulate the rates of wharfage and dockage. *Held*, that the grant was in trust only, with the additional privilege to make certain improvements in the harbor, and was revocable, except as to such lands as, at the time of the repeal thereof, had already been improved and reclaimed, upon the faith of the grant.

17. Same—Performance of Conditions—Tender—Failure to Keep Tender Good.

Act Ill. April 16, 1869, granted defendant certain lands in fee, upon payment of a certain sum to the city within the limits of which the land was situate. A tender of the money was made, but the city refused to receive it. *Held*, that a failure to keep the tender good deprived the defendants of all rights acquired thereunder.

In Equity.

W. G. *Ewing*, Dist. Atty., for the United States.

George *Hunt*, Atty. Gen., E. B. *McCagg*, and *Williams & Thompson*, for the People.

B. F. *Ayer*, J. N. *Jewett*, and Lyman *Trumbull*, for Illinois Cent. R. Co.

James K. *Edsall* and A. S. *Bradley*, for Citizens' Committee.

M. W. *Fuller*, for City of Chicago.

Before Harlan, Circuit Justice, and Blodgett, District Judge.

Harlan, Justice. The first of the above-named causes is a suit in equity in the name of the people of the state of Illinois against the Illinois Central Railroad Company, the city of Chicago, and the United States of America. It was commenced in the circuit court of Cook county, Illinois, and subsequently, on the petition of the railroad company, was removed into this court. A motion to remand the cause was denied, upon grounds indicated in *State* v. *Railroad Co.*, 16 Fed. Rep. 881. The railroad company and the city filed answers, and the latter also filed a cross-bill for affirmative relief against the state and its co-defendants. To that cross-bill the company filed an answer, as did also the attorney general of Illinois in behalf of the state. The United States has not appeared, either in the original or cross suit. This cause may be regarded as under submission for final decree as between the state, the railroad company, and the city in the original suit; also as between the city and the railroad company in the cross-suit. Notwithstanding the appearance in the cross-suit of the attorney general of Illinois in behalf of the state, some question is made as to the jurisdiction of the court to give to the city any affirmative relief against the state. But that question need not be decided, since all the issues between the state and the city can be finally determined in the original suit brought by the state. The last named of the causes is an information in equity by the United States against the Illinois Central Railroad Company, the Michigan Central Railroad Company, the Chicago, Burlington & Quincy Railroad Company, the Baltimore & Ohio Railroad Company, and the city of Chicago.

That case is now before us upon demurrer by the two first-named companies to the information.

The general object of these suits is to obtain a judicial determination of the rights of the parties in respect to certain lands on the east or lake front of the city of Chicago, south of Chicago river, upon some of which are tracks, depots, warehouses, piers, and other structures erected by the Illinois Central Railroad Company; and also in respect to the submerged lands within the limits of the city of Chicago, and of the state of Illinois, "constituting the bed of Lake Michigan, and lying east of the tracks and breakwater" of that company, "for the distance of one mile, and between the south line of the south pier [near Chicago river] extended eastwardly, and a line extended eastward from the south line of lot 21, south of and near the round-house and machine-shops of said company." The cases, besides, involve an inquiry as to the right of the railroad company, for the promotion as well of its own business as of commerce and navigation generally, to erect and maintain wharves, piers, and docks in the harbor of Chicago. Some of these lands were formerly a part of what was known as "Fort Dearborn Military Post," or the S. W. ¼ of fractional section 10, near the mouth of Chicago river; others, a part of fractional section 15; while others are in section 22,—all of said sections being in township 39 N., range 14 E. of the third P. M., and on the shore of Lake Michigan, in the order named. It is necessary to a clear understanding of the numerous questions presented for determination that we should first trace the history of the title to these several bodies of lands up to the time when the Illinois Central Railroad was located within the limits of Chicago.

1. *As to the Lands Embraced in the Fort Dearborn Reservation.* In the year 1804, the United States established the military post of Fort Dearborn, immediately south of Chicago river, and near its mouth, upon the S. W. fractional ¼ of section 10. It was occupied by troops, as well when Illinois, in 1818, was admitted into the Union, as when congress passed the act of March 3, 1819, authorizing the sale of certain military sites. By that act it was provided "that the secretary of war be, and he is hereby, authorized, under the direction of the president of the United States, to cause to be sold such military sites, belonging to the United States, as may have been found or become useless for military purposes. And the secretary of war is hereby authorized, on the payment of the consideration agreed for into the treasury of the United States, to make, execute, and deliver all needful instruments conveying and transferring the same in fee; and the jurisdiction which had been specially ceded, for military purposes, to the United States by a state, over such site or sites, shall thereafter cease." 3 St. 520. In 1824, upon the written request of the secretary of war, the S. W. ¼ of fractional section 10, containing about 57 acres, and within which Fort Dearborn was situated, was formally reserved by the commissioner of the general land-office from sale, and for military purposes. *Wilcox* v. *Jackson*, 13 Pet. 499, 452. The United States admit, and it is also proved, that the lands so reserved were subdivided in 1837, by authority of the secretary,—he being represented

by one Matthew Birchard, as special agent and attorney for that purpose,—into blocks, lots, streets, and public grounds, called the "Fort Dearborn Addition to Chicago." And on the 7th day of June, 1839, a map or plat of that addition was acknowledged by Birchard as such agent and attorney, and was recorded in the proper local office. A part of the ground embraced in that subdivision was marked on the recorded plat, "Public ground, forever to remain vacant of buildings." The plat of that subdivision, called "Map A," is reproduced, and in the margin will be found the certificates which appear on the plat as made and recorded.[1]

The lots designated on this plat were sold and conveyed by the United States to different purchasers. The sale and conveyance (to use the words of the information filed by the United States) was "by and according to the said plat, and with reference to the same." But it should be stated that at the time of the first sales, the United States expressly reserved from sale all of the Fort Dearborn addition (including the ground marked for streets) north of the south line of lot 8 in block 2, lots 4 and

[1] Fort Dearborn addition to Chicago, as represented on the adjacent plat, is laid out into blocks, lots, and streets upon, and embraces the whole of, the south-west fractional quarter of section ten, (10,) township thirty-nine (39) north, range No. fourteen (14) east of the 3d principal meridian. The largest figures on said plat indicate the number of the blocks. The next smaller figures, near the center of the lots, show the number of the lots, respectively, in each block. The next size of figures, still smaller, in the interior side of the boundary of the several streets, and on the division lines of the lots, represent the measurement of the respective lots in feet and inches. The figures written transversely to and in the streets and alleys show the width of the same in feet at different points, and the figures on the exterior lines of the blocks represent the measurement of the blocks upon which they stand. From the west boundary of the said fraction of section (10) is laid off and appropriated 60 feet in width, as an addition to State street; and from the south boundary of said section, 40 feet, as an addition to Madison street. The width of the rear of the water lots bounded upon the Chicago river is determined and established by posts set at the intersection of the lines of the lots and streets, with meanders of the river, as shown by the notes thereof entered upon the meander lines. The lines between the lots in block (2) are run at right angles to the N. W. line of River street. The public ground between Randolph and Madison streets, and fronting upon Lake Michigan, is not to be occupied with buildings of any description. At the S. E. corner of block (13) at the angle of Wabash and Washington streets is set a lime-stone, 4 by 6 inches, and 2 feet long, at least 18 inches below the natural surface of the ground; also another stone of similar description is set at the angle formed by the junction of River with South Water street, in block (3;) and also one other stone of like dimensions at the N. E. corner of block (7,) at the angle of South Water street and Michigan avenue. At the corner of sections 9, 10, 15, and 16 is a stone near the center of State street, which was set by the commissioners of the Illinois and Michigan canal in 1836. The bearing of south Water, Lake, Randolph, and Washington is N., 83° E. The bearing or course of Madison street is N., 82° E. The course of River street from South Water street to Harbor street is N., 29° E.; thence to Lake Michigan, N., 83° E. Course of State and Wabash streets and Michigan avenue is N., 8° 5' W. All bearings were taken without any variations of the compass.

For J. R. POINSETT, Sec. at War.

M. BIRCHARD, Agent & Atty.

State of Illinois, Cook County: Be it remembered that on this seventh day of June, in the year of our Lord one thousand eight hundred and thirty-nine, before me, Henry Brown, a justice of the peace in and for said county, came Matthew Birchard, solicitor of the general land-office and agent of the war department of the United States, to me personally known, and exhibited a power of attorney from the secretary of the department of war of the United States, executed officially by said secretary under the seal of said department, by direction of the president of the United States, authorizing him, the said Mathew Birchard, to cause to be surveyed, platted, duly acknowledged, and recorded as an addition to the town of Chicago, Illinois, the south-west fractional quarter of section ten, heretofore reserved for military purposes, and the site of Fort Dearborn, and the same to sell, etc., and acknowledged the foregoing map to be the map and plat of the Fort Dearborn addition to the town of Chicago, and that the United States of America are the sole proprietors and the owners of the same.

HENRY BROWN, Justice of the Peace.

*MAP A*

# FORT DEARBORN ADDITION TO CHICAGO.

9 in block 4, and lot 5 in block 5, projecting said lines across the adjacent streets. The grounds so specially reserved remained in the occupancy of the general government for military purposes from 1839 until after 1845. The legal effect of that occupancy appears in *U. S.* v. *Chicago,* 7 How. 185. The city of Chicago having proposed, in 1844, to open Michigan avenue through the lands so reserved from sale, notwithstanding, at the time, they were in actual use for military purposes, the United States instituted a suit in equity to restrain the city from so doing. It appeared in the case that the agent of the general government gave notice, at the time of selling the other lots, that the ground in actual use by the United States was not then to be sold. It also appeared that the act of March 4, 1837, incorporating the city of Chicago, and designating the district of country embraced within its limits, expressly excepted "the south-west fractional quarter of section 10, occupied as a military post, *until the same shall become private property.*" Laws Ill. 1837, pp. 38, 74. The court held that the city had no right to open streets through that part of the ground which, although laid out in lots and streets, had not been sold by the government; that its corporate powers were limited to the part which, by sale, had become private property; and that the streets laid out and dedicated to public use by Birchard, the agent of the secretary of war, did not, merely by his surveying the land into lots and streets, and making and recording a map or plat thereof, convey the legal estate in such streets to the city, and thereby authorize it to open them for public use, and assume full municipal control thereof. The court held to be untenable the claim of the city that "because streets had been laid down on the plan by the agent, [Birchard,] part of which extended into the land not sold, those parts had, by this alone, become dedicated as highways, and the United States had become estopped to object." Further: "It is entirely unsupported by principle or precedent that an agent, *merely by protracting on the plan* those streets into the reserved line, and amidst lands not sold, nor meant then to be sold, but expressly reserved, could deprive the United States of its title to real estate, and to its important public works." See, also, *Irwin* v. *Dixin,* 9 How. 31.

2. *As to the Lands in Controversy Embraced in Fractional Section 15.* This section is on the lake shore, immediately south of section 10. The particular lands, the history of the title to which is to be now examined, are between the west line of the street now known as "Michigan Avenue" and the roadway or way-ground of the Illinois Central Railroad Company, and between the middle line of Madison street and the middle line of Twelfth street, excluding what is known as "Park Row," or block 23, north of Twelfth street. By an act of the Illinois legislature of February 14, 1823, entitled "An act to provide for the improvement of the internal navigation of this state," certain persons were constituted commissioners to devise and report upon measures for connecting, by means of a canal and locks, the navigable waters of the Illinois river and Lake Michigan. Laws Ill. 1823, p. 151. This was followed by an act of congress, approved March 2, 1827, entitled "An act to grant a quantity of land to the state of Illinois, for the purpose of aiding in opening a

canal to connect the waters of the Illinois river with those of Lake Michigan," granting to this state, for the purposes of such enterprise, a quantity of land, equal to one-half of five sections in width, on each side of the proposed canal, (reserving each alternate section to the United States,) to be selected by the commissioner of the general land-office, under direction of the president; said lands to be "subject to the disposal of the said state for the purpose aforesaid, and for no other;" and said canal to remain forever a public highway for the use of the national government, free from any charge for any property of the United States passing through it.  4 St. 234, c. 51.  The power of the state to dispose of these lands was further recognized or conferred by the third section of the act, as follows: "Sec. 3.  That the said state, under the authority of the legislature thereof, after the selection shall have been so made, shall have power to sell and convey the whole or any part of the said land, and to give a title in fee-simple therefor to whomsoever shall purchase the whole or any part thereof."  4 St. 234.  By an act of the Illinois legislature of January 22, 1829, entitled "An act to provide for constructing the Illinois and Michigan canal," the commissioners for whose appointment that act made provision were directed to select, in conjunction with the commissioner of the general land-office, the alternate sections of land granted by the act of congress; such commissioners being invested with the power, among others, "to lay off such parts of said donation *into town lots as they may think proper*, and *to sell the same at public sale* in the same manner as is provided in this act for the sale of other lands."  Laws Ill. 1829.  The act of 1829 was amended February 15, 1831, so as to constitute the canal commissioners a board, to be known as the "Board of Canal Commissioners of the Illinois and Michigan Canal," with authority to contract and be contracted with, sue and be sued, plead and be impleaded, and with power of control in all matters relating to said canal.  Laws Ill. 1830–31, p. 39.  Pursuant to and in conformity with said acts of congress and of the legislature of Illinois, the selection of lands for the purposes specified was made by the proper authorities, and approved by the president on the 21st of May, 1830.  Among the lands so selected was said fractional section 15.  By an act of the Illinois legislature, approved January 9, 1836, entitled "An act for the construction of the Illinois and Michigan canal," the governor was empowered to negotiate a loan of not exceeding $500,000, on the credit and faith of the state, as therein provided, for the purpose of aiding, in connection with such means as might be received from the United States, in the construction of the Illinois and Michigan canal, for which loan should be issued certificates of stock, to be called the "Illinois and Michigan Canal Stock," signed by the auditor, and countersigned by the treasurer, bearing an interest not exceeding 6 per cent., payable semi-annually, and "reimbursable" at the pleasure of the state at any time after 1860; and for the payment of which, principal and interest, the faith of the state was irrevocably pledged.  The same act provided for the appointment of three commissioners, to constitute a board to be known as "The Board of Commissioners of the Illinois and Michigan Canal," and to be a body politic

and corporate, with power to contract and be contracted with, sue and be sued, plead and be impleaded, in all matters and things relating to them as canal companies, and to have the immediate care and superintendence of the canal, and all matters relating thereto. Laws Ill. 1836, p. 145. That act contained, among other provisions, the following:

"Sec. 32. The commissioners shall examine the whole canal route, and select such places thereon as may be eligible for town-sites, and cause the same to be laid off into town lots, and *they shall cause the canal lands in or near Chicago, suitable therefor, to be laid off into town lots.*

"Sec. 33. And the said board of canal commissioners shall, on the 20th day of June next, proceed to sell the lots in the town of Chicago, and such parts of the lots in the town of Ottawa, *as also fractional section fifteen adjoining the town of Chicago, it being first laid off and subdivided into town lots, streets, and alleys,* as in their best judgment will best promote the interest of the said canal fund: provided, always, that, before any of the aforesaid town lots shall be offered for sale, public notice of such sale shall have been given. * * *" Laws Ill. 1836, p. 149.

The revenue arising from the canal, and from any lands granted by the United States to the state for its construction, together with the net tolls thereof, were pledged by the act for the payment of the interest accruing on the said stock, and for the reimbursement of the principal of the same. Laws Ill. 1836, p. 153. In 1836, the canal commissioners, under the authority conferred upon them by the statutes above recited, caused fractional section 15 to be subdivided into lots, blocks, streets, etc., a map whereof was made, acknowledged, and recorded on the 20th of July, 1836. A map (the official certificates as they appear on the original map as recorded being in the margin[1]) is reproduced as "Map B."

It is proper to say that upon some of the maps in evidence, and duly certified, the words "Michigan Avenue" are nearer to the shore-line than they appear to be on may B. This fact tends to show that the entire space between the shore-line and the lots into which fractional section 15 was subdivided was originally intended as an avenue, or public grounds or commons. At the time this map was made and recorded, fractional

---

[1] *State of Illinois, Cook County—ss.:* We, the undersigned, commissioners of the Illinois and Michigan canal, in pursuance of the statute in such case made and provided, have caused fractional section number fifteen, (15) township thirty-nine north, range fourteen east, adjoining or cornering with the original town of Chicago, to be laid off into lots, etc., as appears by the above plat. Planted stones as designated at different corners, from which to make future surveys. And we do hereby acknowledge the same the full width and length of the lots, and width of the streets and avenues, as marked, delineated, and laid down, as and for the true plat or map of the subdivision of said section.

Given under our hands and seals at Chicago, the thirteenth day of June, A. D. 1836.
[Signed]                                W. F. THORNTON. [Seal.]
      "                                 W. B. ARCHER. [Seal.]
      "                                 G. S. HUBBARD. [Seal.]

*Recorder's Office, Cook County, Illinois—ss.:* I certify that the foregoing map of fractional section 15 was filed for record on the 18th day of June, 1836, and was duly recorded on the 20th day of July, 1836, in Book H, page 230.
[Signed]                RICHARD J. HAMILTON, Recorder Cook County, Illinois.

*State of Illinois, County of Cook—ss.:* On this thirteenth day of June, in the year one thousand eight hundred and thirty-six, personally appeared before the undersigned, one of the justices of the supreme court of the state of Illinois, W. F. Thornton, W. B. Archer, and G. S. Hubbard, known to the undersigned to be the same persons who have signed and sealed this map, who severally acknowledged the same to be the true and original map of fractional section number fifteen, township thirty-nine north, range

MAP

OF

Fractional Section No. Fifteen, Tp. 39 North, Range 14 East of the Third Principal Meridian. Surveyed and Subdivided by the Board of Canal Commissioners, pursuant to Laws, in the Month of April, A. D. 1836.

sections 15 and 10 were both within the limits of the "town" of Chicago, except that by the act of February 11, 1835, changing the corporate powers of that town, it was provided "that the authority of the board of trustees of the said town of Chicago shall not extend over the south fractional section 10 until the same shall cease to be occupied by the United States." Laws Ill. 1835, p. 204. But prior to the survey and recording of the plat of fractional section 10, to-wit, by the act of March 4, 1837, the city of Chicago was incorporated, and its limits defined, (excluding, as we have seen, "the south-west fractional quarter of section 10, occupied as a military post, until the same shall become private property,") and was invested with all the estate, real and personal, belonging to or held in trust by the trustees of the town; its common council being empowered to lay out, make, and assess streets, alleys, lanes, and highways in said city, to make wharves and slips at the end of the streets, on property belonging to said city, and to alter, widen, straighten, and discontinue the same. Laws Ill. 1837, p. 61, § 38; Id. p. 74, § 61.

This brings us, in the chronological order of events relating to this litigation, to the incorporation of the Illinois Central Railroad Company, and the location of its road within the limits of the city of Chicago. Congress having, by an act approved September 20, 1850, (9 St. 466, c. 61,) made a grant of land to Illinois for the purpose of aiding the construction of a railroad from the southern terminus of the Illinois & Michigan canal to a point at or near the junction of the Ohio and Mississippi rivers, with branches to Chicago and Dubuque, the Illinois Central railroad Company was incorporated February 10, 1851, and made the agent of the state to construct that road. Priv. Laws Ill. 1851, p. 61. It was granted power by its charter "to survey, locate, construct, complete, alter, maintain, and operate a railroad, with one or more tracks or lines of rails, from the southern terminus of the Illinois and Michigan canal to a point at the city of Cairo, with a branch of the same to the city of Chicago, on Lake Michigan; and also a branch, via the City of Galena,

fourteen east of the third principal meridian, as surveyed and subdivided by them pursuant to law.

Given at Chicago the day and year before recited.

[Signed]                                        THEOPHILUS W. SMITH.

I, Edward B. Talcott, assistant engineer in the employment of the board of commissioners of the Illinois and Michigan canal, do hereby certify that the above is a correct plat or map of fractional section number fifteen, township thirty-nine north, range fourteen east of the third principal meridian, adjoining or cornering with the original town of Chicago, as subdivided and laid off into lots, etc., under the direction of said board of commissioners, and that the same portrays and sets forth the size, width, and length of the lots, also the true and fixed width of the streets and avenues. The letter "S" at the corners of the section and blocks, as marked, denotes where stones are planted deep in the ground, from which to make future surveys.

Given under my hand at Chicago, the 13th day of June, A. D. 1836.

[Signed]                         EDWARD B. TALCOTT, Assistant Engineer.

Filed June 18, 1836.

I, Robert Milne, secretary of the board of canal commissioners, certify that the above map or plat, with the certificates annexed of W. F. Thornton, W. B. Archer, and G. S. Hubbard, Edward B. Talcott, assistant engineer, Richard J. Hamilton, recorder, and Theophilus W. Smith, is a true copy of the original now in this office.

Witness my hand and the seal of the board of canal commissioners, this 19th day of February, A. D. 1873.

[Signed]                                        ROBERT MILNE, Secretary.

*Canal Office, Lockport, Illinois, February 19, 1873.*

to a point on the Mississippi river opposite the town of Dubuque, in the state of Iowa." In addition to certain powers, privileges, immunities, and franchises,—including the right to purchase, hold, and convey real and personal estate, which might be needful to carry into effect the purposes and objects of its charter,—it was provided that the company "shall have the right of way upon, and may appropriate to its sole use and control, for the purposes contemplated herein, land not exceeding two hundred feet in width through its entire length; may enter upon, and take possession of, and use, all and singular, any lands, streams, and materials of every kind for the location of depots and stopping stages, for the purposes of constructing bridges, dams, embankments, excavations, station grounds, spoil banks, turn-outs, engine-houses, shops, and other buildings necessary for the construction, completing, altering, maintaining, preserving, and complete operation of said road. All such lands, waters, materials, and privileges *belonging to the state* are hereby granted to said corporation for said purposes: * * ' * provided, that nothing in this section contained shall be so construed as to authorize the said corporation to interrupt the navigation of said streams." Section 3. But the company's charter also provided, (section 8:) "*Nothing in this act contained shall authorize said corporation to make a location of their tract within any city without the consent of the common council of said city.*"

Such consent was given by an ordinance of the common council of Chicago, adopted June 14, 1852, whereby permission was granted to the company to lay down, construct, and maintain within the limits of that city, and along the margin of the lake within and adjacent to the same, a railroad with one or more tracks, and to have the right of way and all powers incident to and necessary therefor, upon certain terms and conditions, to-wit: "The said road shall enter at or near the intersection of its southern boundary with Lake Michigan, and following the shore on or near the margin of said lake northerly to the southern bounds of the open space known as 'Lake Park,' in front of canal section fifteen, and continue northerly *across the open space in front of said section fifteen,* to such grounds as the said company may acquire between the north line of Randolph street and the Chicago river, in the Fort Dearborn addition in said city; upon which said grounds shall be located the depot of said railroad within the city, and such other buildings, slips, or apparatus as may be necessary and convenient for the business of said company. But it is expressly understood that the city of Chicago does not undertake to obtain for said company any right of way, or other right, privilege, or easement, not now in the power of said city to grant or confer, or to assume any liability or responsibility for the acts of said company." Section 1. By other sections of the ordinance it was provided as follows: By the second section, that the company might "enter upon and use in perpetuity for its said line of road, and other works necessary to protect the same from the lake, a width of 300 feet, from the southern boundary of said public ground near Twelfth street to the northern line of Randolph street; the inner or west line of the ground to be used by said company to be not less than 400 feet east from the west line of Michigan avenue and par-

allel thereto." By the third section, that they "may extend their works and fill out into the lake to a point in the southern pier not less than 400 feet west from the present east end of the same, thence parallel with Michigan avenue to the north line of Randolph street extended; but it is expressly understood that the common council does not grant any right or privilege beyond the limits above specified, nor beyond the line that may be actually occupied by the works of said company." By the sixth section, that the company "shall erect and maintain on the western or inner line of the ground pointed out for its main track on the lake shore, as the same is hereinbefore defined, such suitable walls, fences, or other sufficient works as will prevent animals from straying upon or obstructing its tracks, and secure persons and property from danger; said structure to be of suitable materials and sightly appearance, and of such heights as the common council may direct, and no change thereon shall be made except by mutual consent: provided, that the company shall construct such suitable gates at proper places at the ends of the streets, which are now or may hereafter be laid out, as may be required by the common council, to afford safe access to the lake: and provided, also, that in case of the construction of an outside harbor, streets may be laid out to approach the same, in the manner provided by law; in which case the common council may regulate the speed of locomotives and trains across them." By the seventh section, that the company "shall erect and complete within three years after they shall have accepted this ordinance, and shall forever thereafter maintain, a continuous wall or structure of stone masonry, pier-work, or other sufficient material, of regular and sightly appearance, and not to exceed in height the general level of Michigan avenue opposite thereto, from the north side of Randolph street to the southern bound of Lake park before mentioned, at a distance of not more than 300 feet east from and parallel with the western or inner line, pointed out for said company, as specified in section two hereof, and shall continue said works, to the southern boundary of the city, at such distance outside of the track of said road as may be expedient; which structure and works shall be of sufficient strength and magnitude to protect the entire front of said city, between the north line of Randolph street and its southern boundary, from further damage or injury from the action of the waters of Lake Michigan; and that part of the structure south of Lake park shall be commenced and prosecuted with all reasonable dispatch after acceptance of this ordinance." By the eighth section, that the company "shall not in any manner, nor for any purpose whatever, occupy, use, or intrude upon the open ground known as 'Lake Park,' belonging to the city of Chicago, lying between Michigan avenue and the western or inner line before mentioned, except so far as the common council may consent, for the convenience of said company, while constructing or repairing the works in front of said ground." By the ninth section, that the company "shall erect no buildings between the north line of Randolph street and the south line of the said Lake park, nor occupy nor use the works proposed to be constructed between these points, except for the passage of or for making up or distributing their trains,

nor place upon any part of their works between said points any obstruction to the view of the lake from the shore, nor suffer their locomotives, cars, or other articles to remain upon their tracks, but only erect such works as are proper for the construction of their necessary tracks, and protection of the same." The company was given 90 days within which to accept the ordinance, and it was provided that, upon such acceptance, its terms should be embodied in a contract between the city and the company. The ordinance was accepted, and the required agreement entered into, on the 8th day of July, 1852.

At the time this ordinance was passed, the harbor of the city included, under the laws of the state incorporating the city, "the piers, and so much of Lake Michigan as lies within the distance of one mile thereof into the lake, and the Chicago river and its branches to their respective sources." Laws Ill. 2d Sess. 1849 and 1851, pp. 132, 147. Its common council had power, at the public expense, to construct a breakwater or barrier along the shore of the lake for the protection of the city against the encroachments of the water; "to preserve the harbor; to prevent any use of the same, or any act in relation thereto,   *   *   *   tending in any degree to fill up or obstruct the same; to prevent and punish the casting or depositing therein any earths, ashes, or other substance, filth, logs, or floating matter; to prevent and remove all obstructions therein, and to punish the authors thereof; to regulate and prescribe the mode and speed of entering and leaving the harbor, and of coming to and departing from the wharves and streets of the city by steam-boats, canal-boats, and other crafts and vessels;   *   *   *   and to regulate and prescribe by such ordinances, or through their harbor-master, or other authorized officer, such a location of every canal-boat, steam-boat, or other craft or vessel or float, and such changes of station in and use of the harbor, as may be necessary to promote order therein, and the safety and equal convenience, as near as may be, of all such boats, vessels, crafts, or floats;" "to remove and prevent all obstructions in the waters which are public highways in said city, and to widen, straighten, and deepen the same;" and to "make wharves and slips at the end of streets, and alter, widen, contract, straighten, and discontinue the same." Id.

Under the authority of its charter, and of the ordinance of June 14, 1852, the railroad company located its tracks within the corporate limits of the city. The tracks northward from Twelfth street were laid upon piling placed in the waters of the lake,—the shore-line, which was crooked, being, at that time, at Park row, about 400 feet from the west line of Michigan avenue; at the foot of Monroe and Madison streets, about 90 feet; and at Randolph street, about 112½ feet. Since that time the space between the shore-line and the tracks of the railroad company has been filled with earth by or under the direction of the city, and is now solid ground. After the construction of the track as just stated, the railroad company erected a breakwater east of its roadway, upon a line parallel with the west line of Michigan avenue, and subsequently filled the space, or nearly all of it, between that breakwater and its tracks, and under its tracks, with earth and stone.

It is stated by counsel, and the record, we think, sufficiently shows, that when the road was located in 1852 nearly all of the lots bordering upon the lake *north of Randolph street* had become the property of individuals, by purchase from the United States, except a parcel adjacent to the river which had not then been sold by the general government. Soon thereafter the company acquired the title to all of the water lots in the Fort Dearborn addition north of Randolph street, including the remaining parcel belonging to the United States. The deed for the latter was made by the secretary of war, October 14, 1852, and included "all the accretions made, or to be made, by said lake and river in front of the land hereby conveyed, and all other rights and privileges appertaining to the United States as owners of said land." The company established its passenger-house at the place designated in the ordinance of 1852, and, being the owner of said water lots north of Randolph street, it gradually pushed its works out into the shallow water of the lake to the exterior line specified in that ordinance, 1,376 feet east of the west line of Michigan avenue. In order that the railroad company might approach its passenger depot, the common council, by ordinance adopted September 10, 1855, granted it permission to curve its tracks westwardly of the line fixed by the ordinance of 1852, "so as to cross said line at a point not more than 200 feet south of Randolph street, extending and curving said tracks north-westerly as they approach the depot, and crossing the north line of Randolph street extended at a point not more than 100 feet west of the line fixed by the ordinance, in accordance with the map or plat thereof submitted by said company, and placed on file for reference." This grant was, however, upon the following conditions: That the company lay out upon its own land, west of and alongside its passenger-house, a street 50 feet wide, extending from Water street to Randolph street, and fill the same up its entire length within two years from the passage of said ordinance; that it should be restricted in the use of its tracks south of the north line of Randolph street, as provided in the ordinance of 1852; and "when the company shall fill up its said tracks south of the north line of that street down to the point where said curves and side tracks commence, and the city shall grant its permission so to fill up its tracks, it should also fill up at the same time and to an equal height, all the space between the track so filled up and the lake shore as it now exists, from the north side of Randolph street down to the point where said curves and side tracks intersect the line fixed by the ordinance aforesaid." The company's tracks were curved as permitted; the street referred to was opened, and has ever since been used by the public; and the required filling was done. It being necessary that the railroad company should have additional means of approaching and using its station grounds between Randolph street and the Chicago river, the city, by another ordinance adopted September 15, 1856, granted it permission "to enter and use in perpetuity, for its line of railroad and other works necessary to protect the same from the lake, the space between its present [then] breakwater and a line drawn from a point on said breakwater 700 feet south of the north line of Randolph

extended, and running thence on a straight line to the south-east corner of its present breakwater, thence to the river: provided, however, and this permission is only given upon the express condition that, the portion of said line which lies south of the north line of Randolph street extended shall be kept subject to all the conditions and restrictions, as to the use of the same, as are imposed upon that part of said line by the said ordinance of June 14, 1852." In 1867 the company made a large slip just outside of the exterior line fixed by the ordinance of 1852, thereby extending its occupancy between Randolph street and Chicago river further to the east. Along the outer edge of this pier a continuous line of dock piling was placed, extending on a line from the river to the north line of Randolph street, 1,792 feet distant from the west line of Michigan avenue. This line formed the company's breakwater between the river and Randolph street at the time of the passage (April 16, 1869) of what is known as the "Lake Front Act." In view of the important questions raised, and of the rights asserted, under that act, it is here given in full:

"An act in relation to a portion of the submerged lands and Lake Park grounds, lying on and adjacent to the shore of Lake Michigan, on the eastern frontage of the city of Chicago.

"Section 1. Be it enacted by the people of the state of Illinois, represented in the general assembly, that all right, title, and interest of the state of Illinois in and to so much of fractional section 15, township thirty-nine, range fourteen east of the third principal meridian, in the city of Chicago, county of Cook, and state of Illinois, as is situated east of Michigan avenue and north of Park row, and south of the south line of Monroe street, and west of a line running parallel with and four hundred feet east of the west line of said Michigan avenue,—being a strip of land four hundred feet in width, including said avenue, along the shore of Lake Michigan, and partially submerged by the waters of said lake,—are hereby granted in fee to the said city of Chicago, with full power and authority to sell and convey all of said tract east of said avenue, leaving said avenue ninety feet in width, in such manner and upon such terms as the common council of said city may by ordinance provide: provided, that no sale or conveyance of said property, or any part thereof, shall be valid, unless the same be approved by a vote of not less than three-fourths of all the aldermen elect.

"Sec. 2. The proceeds of the sale of any and all of said lands shall be set aside, and shall constitute a fund, to be designated as the 'Park Fund' of the said city of Chicago; and said fund shall be equitably distributed by the common council between the South division, the West division, and the North division of the said city, upon the basis of the assessed value of the taxable real estate of each of said divisions, and shall be applied to the purchase and improvement in each of said divisions, or in the vicinity thereof, of a public park or parks, and for no other purpose whatsoever.

"Sec. 3. The right of the Illinois Central Railroad Company under the grant from the state in its charter, which said grant constitutes a part of the consideration for which the said company pays to the state at least seven per cent. of its gross earnings, and under and by virtue of its appropriation, occupancy, use, and control, and the riparian ownership incident to such grant, appropriation, occupancy, use, and control, in and to the lands, submerged or otherwise, lying east of the said line, running parallel with and 400 feet east of the west line of Michigan avenue, in fractional sections ten and fifteen, township and range as aforesaid, is hereby confirmed; and all the right and title of the state of Illinois

in and to the submerged lands constituting the bed of Lake Michigan, and lying east of the tracks and breakwater of the Illinois Central Railroad Company, for the distance of one mile, and between the south line of the south pier extended eastwardly and a line extended eastward from the south line of lot twenty-one, south of and near to the round-house and machine-shops of said company, in the South division of the said city of Chicago, are hereby granted in fee to the said Illinois Central Railroad Company, its successors and assigns: provided, however, that the fee to said lands shall be held by said company in perpetuity, and that the said company shall not have power to grant, sell, or convey the fee to the same; and that all gross receipts from use, profits, leases, or otherwise of said lands, or the improvements thereon, or that may hereafter be made thereon, shall form a part of the gross proceeds, receipts, and income of the said Illinois Central Railroad Company, upon which said company shall forever pay into the state treasury, semi-annually, the per centum provided for in its charter, in accordance with the requirements of said charter: and provided, also, that nothing herein contained shall authorize obstructions to the Chicago harbor, or impair the public right of navigation; nor shall this act be construed to exempt the Illinois Central Railroad Company, its lessees or assigns, from any act of the general assembly which may be hereafter passed regulating the rates of wharfage and dockage to be charged in said harbor: and provided, further, that any of the lands hereby granted to the Illinois Central Railroad Company, and the improvements now, or which may hereafter be, on the same, which shall hereafter be leased by said Illinois Central railroad Company to any person or corporation, or which may hereafter be occupied by any person or corporation other than said Illinois Central Railroad Company, shall not, during the continuance of such leasehold estate or of such occupancy, be exempt from municipal or other taxation.

"Sec. 4. All the right and title of the state of Illinois in and to the lands, submerged or otherwise, lying north of the south line of Monroe street, and south of the south line of Randolph street, and between the east line of Michigan avenue and the track and roadway of the Illinois Central Railroad Company, and constituting parts of fractional sections ten and fifteen in said township thirty-nine, as aforesaid, are hereby granted in fee to the Illinois Central Railroad Company, the Chicago, Burlington and Quincy Railroad Company, and the Michigan Central Railroad Company, their successors and assigns, for the erection thereon of a passenger depot, and for such other purposes as the business of said company may require: provided, that upon all gross receipts of the Illinois Central Railroad Company, from leases of its interest in said grounds, or improvements thereon, or other uses of the same, the per centum provided for in the charter of said company shall forever be paid in conformity with the requirements of said charter.

"Sec. 5. In consideration of the grant to the said Illinois Central, Chicago, Burlington and Quincy, and Michigan Central Railroad Companies of this land as aforesaid, said companies are hereby required to pay to said city of Chicago the sum of eight hundred thousand dollars, to be paid in the following manner, viz.: Two hundred thousand dollars within three months from and after the passage of this act; two hundred thousand dollars within six months from and after the passage of this act; two hundred thousand dollars within nine months from and after the passage of this act; two hundred thousand dollars within twelve months from and after the passage of this act,—which said sums shall be placed in the Park fund of the said city of Chicago, and shall be distributed in like manner as is hereinbefore provided for the distribution of the other funds which may be obtained by said city from the sale of the lands conveyed to it by this act.

"Sec. 6. The common council of the said city of Chicago is hereby authorized and empowered to quitclaim and release to the said Illinois Central Rail-

road Company, the Chicago, Burlington and Quincy Railroad Company, and the Michigan Central Railroad Company any all claim and interest in and upon any and all of said land north of the south line of Monroe street, as aforesaid, which the said city may have by virtue of any expenditures and improvements thereon or otherwise; and in case the said common council shall neglect or refuse thus to quitclaim and release to the said companies, as aforesaid, within four months from and after the passage of this act, then the said companies shall be discharged from all obligation to pay the balance remaining unpaid to said city.

"Sec. 7. The grants to the Illinois Central Railroad Company contained in this act are hereby declared to be upon the express condition that said Illinois Central Railroad Company shall perpetually pay into the treasury of the state of Illinois the per centum on the gross or total proceeds, receipts, or income derived from said road and branches stipulated in its charter, and also the per centum on the gross receipts of said company reserved in this act.

"Sec. 8. This act shall be a public act, and in force from and after its passage.

"Passed, over veto, 16th April, 1869."

As early as May, 1869, the railroad company caused to be prepared a plan for an outer harbor at Chicago. On the 12th of July of the same year the Illinois Central Railroad Company, the Michigan Central Railroad Company, and the Chicago, Burlington & Quincy Railroad Company, by an agent, tendered to Walter Kimball, the comptroller of the city of Chicago, the sum of $200,000, as the first payment to the city under the fifth section of the act of 1869. He received the sum tendered upon the express condition that none of the city's rights be thereby waived, or its interest in any manner prejudiced, and placed the money in bank on special deposit, to await the action and direction of the common council. The matter being brought to the attention of that body, it adopted, June 13, 1870, a resolution declaring that the city "will not recognize the act of Walter Kimball in receiving said money as binding upon the city, and that the city will not receive any money from railroad companies under said act of the general assembly until forced to do so by the courts." The city never quitclaimed or released, nor offered to quitclaim or release, to said companies, or to either of them, any right, title, claim, or interest in or to any of the land described in the act of 1869, nor was Kimball's act in receiving the money ever recognized by the city as binding upon it. On the expiration of his term of office, he did not turn the money over to his successor in office, but kept it deposited in bank to his own individual credit; and so kept it until some time during the year 1874, or later, when, upon application by the railroad companies, he returned it to them. No other money than the $200,000 delivered to Kimball was ever tendered by the railroad companies, or either of them, to the city or to any of its officers. At a meeting of the board of directors of the Illinois Central Railroad Company, held at the company's office in New York, July 6, 1870, a resolution was adopted to the effect "that this company accepts the grants under the act of the legislature at its last session, and that the president give notice thereof to the state, and that the company has commenced work upon the shore of the lake at Chicago under the grants referred to."

On the 17th of November, 1870, its president communicated a copy of this resolution to the secretary of state of Illinois, and gave the notice therein required, adding: "You will please regard the above as an acceptance by this company of the above-mentioned law, [Lake Front act,] and it is desired by said company that said acceptance shall remain permanently on file and of record in your office." The secretary of state replied, under date of November 18, 1870: "Yours of the 17th inst., being a notice of the acceptance by the Illinois Central Railroad Company of the grants under an act of the legislature of Illinois, in force April 16, 1869, was this day received, and filed, and duly recorded in the records of this office."

Following these transactions were certain proceedings, commenced about July 1, 1871, by information filed in this court by the United States against the Illinois Central Railroad Company. That information set forth that congress, in order to promote the convenience and safety of vessels navigating Lake Michigan, had, from time to time, appropriated and expended large sums of money in and about the mouth of Chicago river, and had constructed two piers extending from the north and south banks of that river eastwardly for a considerable distance into the lake; that in July, 1870, it appropriated a large sum of money to construct an outer harbor at Chicago, in accordance with the plans of the engineer department of the United States; that the railroad company had, from time to time, wrongfully filled up with earth a portion of said lake within said harbor; that what the company had then done, in that way, and what it intended to do, unless prevented, would materially interfere with the execution of the plan of improvement adopted by the war department. A temporary injunction was issued against the company. Subsequently, in 1872, the parties to that suit entered into a stipulation, from which it appears that the matters referred to in said information relating to the construction of docks and wharves in the basin or outer harbor of the city, formed by the breakwater then in process of erection by the United States, were referred to the war department, and that the secretary, upon the recommendation of engineer officers, approved certain lines limiting the construction of docks and wharves in said outer harbor, to-wit: Commencing at the pier on the south side of the entrance to the Chicago river, 1,200 feet west of the government breakwater; thence south to an intersection with the north line of Randolph street extended eastwardly; thence due west 800 feet; and thence south to the east and west breakwater proposed to be constructed by the United States, 4,000 feet south of the pier first above mentioned,—the line so established being fixed as the line to which docks and wharves may be extended by parties entitled to construct them within said outer harbor. The railroad company desiring to proceed, under the supervision of the engineer bureau of the United States, with the construction of docks and wharves within the proposed outer harbor, between the pier on the south side of the entrance to Chicago river and the north line of Randolph street extended eastwardly, in conformity with the said limiting lines, and having agreed to observe said lines, as well as the directions which

might be given in reference to the construction of said docks and wharves by the proper officers of said bureau, the injunctional order, pursuant to stipulation between the parties, was, January 16, 1872, vacated, and the information dismissed, with leave to the United States to reinstate the same upon the failure of the company, in good faith, to observe the said conditions. Subsequently the railroad company resumed work on, and during the year 1873 completed, pier No. 1, adjacent to the river, and east of the breakwater of 1869. On the 15th of April 1873, the legislature of Illinois passed the following act, which was in force from and after July 1, 1873: "Section 1. Be it enacted," etc., "that the act entitled 'An act in relation to a portion of the submerged lands and Lake Park grounds lying on and adjacent to the shore of Lake Michigan, on the eastern frontage of the city of Chicago,' in force April 16, 1869, be, and the same is hereby, repealed." In 1880 and 1881, piers Nos. 2 and 3, north of Randolph street, were constructed in conformity with plans submitted to and approved by the war department. The common council of Chicago, by ordinance approved July 12, 1881, extended Randolph street eastwardly, and declared it to be a public street, from its then eastern terminus "to the west line of the right of way of the Illinois Central Railroad Company, as established by the ordinance of September 10, 1855, * * * and also straight eastwardly * * * from the easterly line of slip C, produced southerly to Lake Michigan;" giving permission to the company to construct and maintain at its own expense, within the line of Randolph street so extended, and over the company's tracks and right of way, a bridge or viaduct, with suitable approaches, to be approved by the commissioners of public works, which should be forever free to the public, and to all persons having occasion to pass and repass thereon. Such a bridge or viaduct was necessary in order that the piers constructed, and in process of construction, east of the breakwater of 1869, might be conveniently reached by teams. The viaduct was built in 1881, and extends to the base of pier 3. It has ever since been used by the public. It appears from the evidence that, in 1882, the pier which was built in 1870 from Twelfth street to the north line extended of lot 21, was continued as far south as the center line of Sixteenth street. The main object of this extension, according to the showing made by the company, was to protect the tracts from the waves during storms from the north-east. Another object was to construct a slip or basin south of the south line of lot 21, between the breakwater and the shore, where vessels loaded with materials for the company, or having freight to be handled, could enter and be in safety. In 1885, a pier was constructed by the company at the foot of Thirteenth street, according to a plan submitted to the war department; and the department did not object to its construction, "provided no change be made in its location and length." The pier as constructed does not differ from that proposed and approved, except that it is wider by 50 feet. But it does not appear that the war department regards that change in the plan as injurious to navigation, or as interfering with the plans of the government for an outer harbor.

At the hearing, a map was used for the purpose of showing the differ-
ent works constructed by the United States; the location of all the struct-
ures and buildings erected by the railroad company, with the date of
their erection; and the relation of the tracks and breakwaters of the com-
pany to the shore as it now is, and, to some extent, as it was heretofore.
That map, known as the "Morehouse. Map," and called "C," is repro-
duced.

The state, in the original suit, asks a decree establishing and confirm-
ing her title to the bed of Lake Michigan, and her sole and exclusive
right to develop the harbor of Chicago by the construction of docks,
wharves, etc., as against the claim by the railroad company that it has
an absolute title to said submerged lands, described in the act of 1869,
and the right—subject to the paramount authority of the United States
in respect to the regulation of commerce between the states—to fill the
bed of the lake, for the purposes of its business, east of and adjoining
the premises between the river and the north line of Randolph street,
and also north of the south line of lot 21; and also the right, by con-
structing and maintaining wharves, docks, piers, etc., to improve the
shore of the lake, for the purposes of its business, and for the promotion,
generally, of commerce and navigation. The state, insisting that the
company has, without right, erected, and proposes to continue to erect,
wharves, piers, etc., upon the domain of the state, asks that such un-
lawful structures be directed to be removed, and the company enjoined
from constructing others. The city, by its cross-bill, insists that since
June 7, 1839, when the map of Fort Dearborn addition was recorded, it
has had the control and use for public purposes of that part of section
10 which lies east of Michigan avenue, and between Randolph street and
fractional section 15; and that, as successor of the town of Chicago, it
has had possession and control since June 13, 1836, when the map of
Fractional Section 15 addition was recorded, of the lands in that addi-
tion north of block 23. It asks a decree declaring that it is the owner
in fee, and of the riparian rights thereunto appertaining, of all said
lands, and has, under existing legislation, the exclusive right to develop
the harbor of Chicago by the construction of docks, wharves, and levees,
and to dispose of the same, by lease or otherwise, as authorized by law;
and that the railroad company be enjoined from interfering with its said
rights and ownership. The relief sought by the United States is a decree
declaring the ultimate title and property in the "Public Ground" shown
on the plat of the Fort Dearborn addition, south of Randolph street, and
also in the open space shown on the plat of Fractional Section 15 addi-
tion, to be in the United States, with the right of supervision and con-
trol over the harbor and navigable waters aforesaid; that the railroad
companies and the city be enjoined from exercising any right, power, or
control over said grounds, or over the waters or shores of the lake; that
the Illinois Central Railroad Company be restrained from making or con-
structing any piers, wharves, or docks, and from driving piles, building
walls, or filling with earth or other materials in the said lake, or from us-
ing any made-ground, or any piers, wharves, or other constructions made

MAP C          THE MOREHOUSE MAP

or built by or for it in or about the outer harbor, to the east of the 200-feet strip of its way-ground, or from taking or exacting any toll for such use; and that the Illinois Central Railroad Company be required to abate and remove all obstructions placed by it in said outer harbor, and to quit possession of all lands, waters, and made-ground taken and held by it without right as aforesaid.   The state, the city, and the general government all unite in contending that the Lake Front act of 1869 is inoperative and void, for reasons that will be hereafter stated.

In disposing of the questions discussed by counsel, it will be convenient to consider first those relating to the lands or grounds embraced in the Fort Dearborn addition to Chicago.   It it apparent, from the facts stated, that whatever title the Illinois Central Railroad Company has to the water lots in that addition, between Randolph street and the Chicago river, is derived, as to some of them, directly, and, as to others, remotely, from the United States.   It is, however, insisted, in behalf of the United States, that the subdivision and platting of Fort Dearborn reservation into blocks, lots, streets, and public grounds by Birchard was unauthorized by the act of 1819, under which alone he proceeded, or could have proceeded.   The point made is that upon the secretary of war was conferred the power to dispose of military sites found to be useless, and that such power could not be delegated to or exercised by an agent, although specially appointed by him for that purpose.   In this view the court does not concur.   The direction in the act was that the secretary "cause to be sold" such military sites as were useless,— language implying that he might discharge the duty imposed by congress through the agency of some one representing him.   It certainly could not have been expected that he would visit Chicago, and personally superintend the sale.   The plat shows upon its face, and the United States admits in their information, that Birchard acted in the premises for the secretary of war, and only as his agent.   It further appears that he acted under a power of attorney executed under the direction of the president.

But it is contended that the power to cause these lands to be sold did not authorize the secretary to dedicate a part of it to the public as streets and public grounds.   And, in this connection, the district attorney maintains that the subdivision and platting by Birchard was not in conformity with the Illinois statute of February 27, 1833, for the recording of town plats.   By the fifth section of that act, the plat or map, when made out and certified, acknowledged, and recorded, as required by the statute, was to be deemed, as to every donation or grant to the public therein specified, a sufficient conveyance to vest in the city the fee-simple of the lands so designated, and operated as a general warranty.   It also declared that "the land intended to be for streets, alleys, ways, commons, or other public uses, in any town or city, or addition thereto, shall be held in the corporate name thereof, in trust to and for the uses and purposes set forth and expressed or intended."   It is contended that the dedication of the streets and the public grounds south of Randolph street, on the lake shore, did not conform to the statute, and was, at most, a dedication at common law; in which event, it is insisted, the

fee to the streets and public grounds remains in the United States, notwithstanding the title must be held subject to the public uses by the platting and by the subsequent sales of lots with reference thereto. It seems to the court clear that the power given to the secretary to sell—no particular mode for selling being prescribed—carried with it, by necessary implication, authority to adopt any mode that was not unreasonable; in view of the object to be accomplished, and that was customary in the case of lands within the limits of or near to a town or city. If a subdivision, in the mode ordinarily adopted in the locality, of a large tract, so situated, into blocks, lots, streets, and public grounds, was likely to be beneficial to the government, it was the duty of the secretary to adopt that mode of selling. If the subdivision and platting by Birchard was in conformity to the local statute in all material respects, then no conveyance by the United States of the legal title to the streets and public grounds was necessary. If it did not conform to the local law, and if the dedication of the streets and public grounds, shown on the map of Fort Dearborn addition, is to be deemed only valid as a dedication at common law, it would not follow that the United States can have a standing in court in respect to such streets and public grounds. The argument by the district attorney upon this point proceeds upon the ground that the general government, after abandoning Fort Dearborn as a military site, and after having sold the whole of that reservation, except the parts reserved for streets and public grounds, had the capacity to hold the title to such streets and public grounds in trust for the public uses affixed to it. This position cannot be maintained. The United States took the right, title, and claim, as well of soil as of jurisdiction, which the commonwealth of Virginia had in the Northwest Territory, for the purposes only of temporary government, and in trust for the performance of the stipulations and conditions imposed by the deed of cession. It was accepted as a common fund for the use and benefit of all the states, Virginia included. One of those conditions was that the territory so ceded should be laid out and formed into states, having the same rights of sovereignty, freedom, and independence as the other states. Consequently, when Illinois was admitted into the Union, "upon the same footing with the original states, in all respects whatever," she succeeded to all the rights of sovereignty, jurisdiction, and eminent domain which Virginia possessed at the date of the cession, "except so far as this right was diminished by the public lands remaining in the possession and under the control of the United States, for the temporary purposes provided for in the deed of cession, and of the legislative acts connected with it. Nothing remained to the United States, according to the terms of the agreement, but the public lands. And if an express stipulation had been inserted in the agreement, granting the municipal right of sovereignty and eminent domain to the United States, such stipulation would have been void and inoperative; because the United States have no constitutional capacity to exercise municipal jurisdiction, sovereignty, or eminent domain, within the limits of a state, except in the case in which it is expressly granted." (*Pollard's Lessee* v. *Hagan,* 3

v.33F.no.14—48

How. 212, 223; *New Orleans* v. *U. S.*, 10 Pet. 662;) or where it is necessary to the enjoyment of the powers conferred by the constitution upon the general government, (*Kohl* v. *U. S.*, 91 U. S. 367, 372; *U. S.* v. *Fox*, 94 U. S. 320; *U. S.* v. *Jones*, 109 U. S. 513, 519, 3 Sup. Ct. Rep. 346.) See, also, *Van Brocklin* v. *State of Tennessee*, 117 U. S. 151, 167, 168, 6 Sup. Ct. Rep. 670. When, therefore, Fort Dearborn reservation was subdivided into lots, and they were sold, with reference to the map or plat of such subdivision, and it was no longer used as a military site, or for any purpose connected with the execution of the powers of the general government, all the lands embraced within its limits ceased to be a part of the national domain. the title to the specific lots passed to those who purchased them, while jurisdiction over the streets and open grounds, dedicated to public use, passed from the United States; the title to, and immediate possession and control of, such streets and grounds, vesting in the local government,—that is, in the municipal corporation of Chicago,—as a public agency of the state for the purposes for which such dedication was made. Touching the action of the secretary of war, and of his agent Birchard, it may also be said that its validity was impliedly recognized in the case, already referred to, of *U. S.* v. *Chicago*. The question there was, as we have seen, whether the city had the right to open streets designated on the Birchard plat through that part of Fort Dearborn reservation which had not then been sold, and was still used by the general government as a military site. If the Birchard subdivision was invalid, upon the ground that the secretary could not invest him with power to do what he did, it would have been a ready answer, in that case, to the city's claim of authority to open Michigan avenue through Fort Dearborn reservation to the river, to say that Birchard's subdivision and platting, upon which the city relied, did not bind the United States. On the contrary, the decision proceeded upon the ground that the subdivision and platting was legal, although not done under the personal supervision of the secretary of war; and that the right of the city to open Michigan avenue, as marked on the Birchard map, through that part of the reservation not then sold, would not come into existence until the occupancy of the United States ceased. Whatever doubt may remain upon this point is removed by the act passed by congress, August 1, 1854, for the relief of Jean Baptiste Beaubien, by which the commissioner of the general land-office was authorized to issued to him a patent or patents for certain specified "lots *as described and numbered on the survey and plat of the Fort Dearborn addition to Chicago, in the state of Illinois, made under the order of the secretary of war, and now on file in the war-office.*" This statute is so far a recognition or ratification of the Birchard subdivision, and of the acts of the secretary of war, as to preclude the United States and all others from making any question as to his power to make sale of Fort Dearborn reservation through the agency of Birchard, or as to the authority of the agent to subdivide these lands into blocks, lots, streets, and public grounds.

What has been said is sufficient to show that the United States have long since parted with all jurisdiction over or title to the lands embraced

within that reservation, and that the Illinois Central Railroad Company, shortly after the location of its road within the corporate limits of Chicago, acquired a title in fee to all of the water lots on the lake shore within the Fort Dearborn addition *north of Randolph street.*

What rights did the railroad company have in virtue of such ownership? There can be no doubt that, upon her admission into the Union, the state of Illinois became the owner of, and acquired jurisdiction over, all the lands within her boundaries covered by the waters of Lake Michigan, subject only to such supervision and control of the use of such waters as might result from the exercise by congress of its powers to regulate commerce with foreign nations and among the several states. *Pollard's Lessee* v. *Hagan,* 3 How. 212; *Martin* v. *Waddell,* 16 Pet. 367; *Den* v. *Jersey Co.,* 15 How. 426; *Mumford* v. *Wardell,* 6 Wall. 436; *Weber* v. *Harbor Com'rs,* 18 Wall. 57; *County of St. Clair* v. *Livingston,* 23 Wall. 68; *Barney* v. *Keokuk,* 94 U. S. 339; *Van Brocklin* v. *State of Tennessee,* 117 U. S. 151, 167, 168, 6 Sup. Ct. Rep. 670. Upon this ground both the state and the railroad company rest their respective claims. But it is insisted, and we think rightly, that, in the absence of any legislative or governmental direction as to the manner of the occupancy of the bed of the lake within the state, the railroad company, as the riparian owner of the water lots north of Randolph street, had the right, in virtue of such ownership, and as part of its purchase of such lots, to connect the shore-line by artificial constructions with outside waters that were navigable in fact; although the exercise of that right is at all times subject to to such regulations—at least, those not amounting to prohibition—as the state may establish. These principles find support in numerous cases. *Dutton* v. *Strong,* 1 Black, 24; *Railroad Co.* v. *Schurmier,* 7 Wall. 272; *Yates* v. *Milwaukee,* 10 Wall. 497; *Weber* v. *Harbor Com'rs,* 18 Wall. 57; *Atler* v. *Packet Co.,* 21 Wall 389; *Delaplaine* v. *Railway Co.,* 42 Wis. 214; 1 Dill. Mun. Corp. §§ 70–77. In *Yates* v. *Milwaukee,* one of the questions was as to the rights of riparian owners of lots on Milwaukee river, near Lake Michigan, within the city of Milwaukee, with respect to wharves, piers, and other structures affecting the navigation of that river. The court said: "But, whether the title of the owner of such a lot extends beyond the dry land or not, he is certainly entitled to the rights of a riparian proprietor whose land is bounded by a navigable stream; and among those rights are access to the navigable part of the river from the front of his lot, the right to make a landing, wharf, or pier for his own use, or for the use of the public, subject to such general rules and regulations as the legislature may see proper to interpose for the protection of the rights of the public, whatever those may be." Again: "This riparian right is property, and is valuable; and, though it must be enjoyed in due subjection to the rights of the public, it cannot be arbitrarily or capriciously destroyed or impaired. It is a right of which, when once vested, the owner can only be deprived in accordance with established law, and, if necessary that it be taken for the public good, upon due compensation." It is difficult to perceive any reason why these doctrines are not applicable to the Great Lakes of our country. It was in the exercise of these

riparian rights, and with the consent of the city, that the railroad company, after the location of its road, and prior to 1867, pushed its works into the shallow water east of the shore-line, north of Randolph street, until it reached the exterior line specified in the third section of the ordinance of 1852. Besides, the state—which, from the time of her admission into the Union, owned the bed of the lake thus occupied, and could lawfully permit it to be occupied for purposes not inconsistent with the public rights of navigation—had expressly authorized the railroad company to enter upon, take possession of, and use any lands, waters, or materials belonging to her for the location of its depots, station grounds, turn-outs, engine-houses, shops, and other buildings that were necessary "for the construction, completing, altering, maintaining, preserving, and complete operation of said road," and *that did not interrupt navigation.* It is true that this power, in respect to lands, waters, and materials belonging to the state, within the corporate limits of a city, could not have been exerted by the company, under its charter, unless such city, by its common council, consented to the location of the road within its limits. But when such consent was given by the city of Chicago, upon the conditions specified in the ordinance of 1852,—conditions which it could lawfully impose,—the right of the railroad company, so far as the state and city were concerned, to fill in the lake, to the extent prescribed by that ordinance, and to use the ground thereby made, was placed beyond question. As to the structures erected by the company east of the exterior line designated by the ordinance of 1852, those built in 1867 may be justified—apart from the confirmatory clauses of the act of 1869— under the power expressly given to enter upon, take possession of, and use (provided navigation was not thereby interrupted) any lands or waters of the state that were necessary for the complete operation of the road, for the purpose designated in the charter of the company. And as to the improvements made and structures built in 1873, 1880, 1881, north of Randolph street, they may be justified upon the same ground; and upon the further ground that they were recognized and permitted, if not directly approved, by the proper authorities of the United States, charged with the duty, by acts of congress, of establishing an outer harbor of the city. So far as the United States are concerned, the court cannot regard these structures, or any of them, as interfering in any degree with the the plans adopted, or in contemplation, by the general government in reference to the harbor of Chicago. *Wisconsin* v. *Duluth,* 96 U. S. 379; *South Carolina* v. *Georgia,* 93 U. S. 4. We would not be understood as saying that the state is concluded by the mere failure of the proper officers of the United States, at the time, to forbid the erection of these structures by the company. Nor does the court intend to question the power of the state, by legislation, to prescribe the lines beyond which piers, docks, wharves, and other structures—other than those erected under the authority, express or implied, of the general government—may not be built, by riparian owners, in the waters of the harbor that are navigable in fact. All that we intend now to decide is that, under the showing made, no basis exists for a decree declaring to be illegal the

structures heretofore erected by the company east of the exterior line fixed by the ordinance of 1852; such structures appearing, under the evidence, to have been required by the growing business of the company, and therefore necessary for the "complete operation of the road;" and it not appearing that such use of the waters of the lake interrupts navigation, or materially obstructs the use of the harbor by those engaged in commerce, or interferes with the plans devised by the United States for the improvement of that harbor. Whether a structure interrupts navigation—that is, interferes with the public rights of navigation—must depend upon the circumstances of each case. A structure might interrupt the navigation of a river, while one of like character erected in a great lake would not, in any just sense, impair the public right of navigation.

In respect to the company's right of way from Randolph street to the north line of block 23, the triangular pieces of ground south of Randolph street, and the structures erected by the company south of Park row, but little need be said, in view of the conclusions already announced by the court. The right of way was located in the open waters of the lake. The state consented, in the charter of the company, that the bed of the lake might be used by the company for a right of way; provided the city assented to the location of the tracks within its limits. The city gave its consent by the ordinance of 1852. Nothing more is requisite to show that the tracks of the company were legally located on the line designated for a right of way. The use of such ground, in perpetuity, as a right of way simply, does not violate any right of the state, of the city, or of the United States. Upon the same grounds,—the power given to the company in its charter to enter upon and use any land or waters belonging to the state for a right of way of a prescribed width, and for the location of depots, and for the purpose of constructing station grounds, turnouts, buildings, etc., necessary to the complete operation of its road, and the consent of the city, as manifested in the ordinances of 1855 and 1856,—the occupancy of the two triangular pieces of ground south of Randolph street for the purposes of right of way must be sustained as legal. It would be waste of time to set out the evidence showing that these two pieces of ground are essential to the operation of the road. Without them, as the ordinances of 1855 and 1856 upon their face indicate, the trains of the company could not conveniently approach its passenger depot, freight-yards, and piers.

What has been said upon this branch of the case is decisive of the question before the court in respect to the structures erected by the railroad company south of Park row and north of Sixteenth street. The company is shown to be the owner of all the water lots in front of which such structures have been made. The breakwater there constructed was, according to the evidence, necessary to protect the railroad from the waters of the lake; the old breakwater having become insufficient, under the ordinance of 1852, which, it must be remembered, required the shore to be protected by a continuous stone wall or structure of stone masonry, pier-work, or other material, outside of the track of the road, as might be "expedient," and as would be of the strength and magnitude requisite

to protect the entire front of the city between the north line of Randolph street and its southern boundary against further damage from the action of the waters of the lake. The part of the structure to be erected south of Lake park was required by the ordinance to be commenced and prosecuted with all reasonable dispatch after the acceptance of the ordinance. While the new breakwater is further from the shore than the old one, it does not appear to materially obstruct the use of the navigable waters by the public. As to the large pier at the foot of Thirteenth street, it does not interfere with the public right of navigation. It is wider than was contemplated by the company at the time the plan therefor was submitted to the war department. But such increase of width does not seem to be a matter of any consequence. According to the evidence, none of the structures south of Park row interfere with the public use of the waters of the lake for purposes of commerce and navigation. Their erection may fairly be referred to the riparian ownership of the company, and to its charter right to occupy and use the land and waters of the state for the purposes defined in its charter, provided, only, navigation is not interrupted; and, as their erection was not forbidden by regulations established under the authority of any statute, no ground is shown for the interference of the court. Whether the railroad company, in its erection of wharves, docks, piers, and other structures, has not not gone as far as it may go without interrupting the navigation of the lake, or whether it could lawfully erect other structures on the lake without authority from the legislature of the state, are questions which the court is not now required to determine.

The questions next to be examined relate to the subdivision, in 1836, of fractional section 15 by the canal commissioners. We have seen that the canal commissioners had express legislative authority to make the subdivision, and to sell and convey the lots embraced in it. It was made in conformity, in all material respects, with the Illinois statute of 1833. That is substantially conceded on all hands. As the plat or map of the subdivision was made out, certified, acknowledged, and recorded as required by that act, the fee-simple to the streets, alleys, ways, commons, or other public grounds vested by force of the statute, and without a formal conveyance, in the town of Chicago, in trust for the public uses affixed to them. Section 5; *Canal Trustees* v. *Havens*, 11 Ill. 556; *Gebhart* v. *Reeves*, 75 Ill. 304; *City of Chicago* v. *Rumsey*, 87 Ill. 354; *Zinc Co.* v. *City of La Salle*, 117 Ill. 411, 8 N. E. Rep. 81. And to the estate, real and personal, vested in, or belonging to, or held in trust by, the trustees of the town, the city of Chicago succeeded, under the act of March 4, 1837. So that, when the Lake Front act of 1869 was passed, the fee was in the city of Chicago, subject to the public uses indicated, of all the then open ground south of the middle line of Madison street, and north of Park row, and east of the west line of Michigan avenue. And so, also, is the fee in the city of the made or reclaimed ground between Randolph street and Park row, including the ground upon which rest the tracks and breakwater constructed by the railroad company south of Randolph street. The grant to the city of power to establish "wharves and slips at the ends of

the streets," was in aid of commerce and navigation, and was, by necessary implication, a grant of the lands upon which such wharves and slips might be established; such grant taking effect when structures of that kind were erected. *Williams* v. *Mayor, etc.*, 11 N. E. Rep. 829. And it necessarily implied authority to fill in the lake, for the purpose of such improvements, at least to the point of navigability. If the city had, before the passage of the ordinance of 1852, exerted the power thus conferred, it certainly would have become the owner of all the ground so reclaimed, for the purposes of wharves and slips, at the ends of streets. But the city also had the right, as riparian owner,—its ownership of the open ground east of Michigan avenue extending to the line of the water as it usually stood when free from disturbing causes, (*Seaman* v. *Smith*, 24 Ill. 524,)—to fill in the lake and erect walls to the extent necessary to protect its own and the property of its people from the violence of the waters of the lake; certainly, if it did not thereby interfere with the public rights of navigation. But, if that were not so, the city was expressly given power, by its charter, to erect a breakwater or barrier for protection against encroachment by the waters of the lake. If it had itself erected a breakwater, south of Randolph street, in front of fractional sections 10 and 15, on the precise line adopted by the railroad company under the ordinance of 1852, and filled in the space between the breakwater and the shore-line, it could not be doubted that it would have become the owner of all the ground thus reclaimed and occupied. But, instead of doing that work itself, the city employed the railroad company to do it, in consideration of the grant to that company of the privilege of entering the city, and of laying its tracks in front of Lake Park grounds, and of the open grounds south of Randolph street. When the railroad company established its breakwater, as it agreed with the city to do, and filled in the space set apart for the right of way, and when the space between the shore-line and the company s right of way was filled in by the city, we cannot see but that the latter, as the riparian owner of the land upon the shore-line as it was before any of the filing was done, became also, with the consent of the state, the owner of the fee of all such reclaimed ground, including that occupied by the railroad tracks and the breakwater; such ownership being, however, subject to the use by the railroad company, according to the terms prescribed by the ordinance of 1852, in perpetuity, as a right of way, of the ground upon which its tracks were laid.

This brings us to the consideration of numerous questions arising out of the Lake Front act of 1869. If that act contained no other provisions than those relating to the express grant to the Illinois Central Railroad Company of the submerged lands described in section 3, the first and principal question to be determined would be as to the validity of the repealing act of 1873. But, as will be seen, the former act did something more than grant the right and title of the state in the submerged lands constituting the bed of the lake within certain limits. It confirmed, by the third section, certain rights which the railroad company had previously acquired in other lands. As, in our judgment, the repeal of 1873, for

reasons to be hereafter stated, did not abrogate all the provisions of the act of 1869, and as the opinion of the court seems to be desired upon all the points raised as to the latter act, we must first consider whether it be true, as asserted, that the act of 1869 was inoperative for every purpose, and as to all of its provisions. Indeed, it would, in our judgment, be premature, if not unseemly, to consider what was the scope or effect of the act of 1869, or inquire as to the validity of the act of 1873, without first examining the grounds upon which it is contended that the act of 1869 never became, as to any of its provisions, a law of the state.

The constitution of that state, adopted in 1848, and in force in 1869, contained these provisions: "Each house shall keep a journal of its proceedings. The yeas and nays of the members on any question shall, at the desire of any two of them, be entered on the journals." Art. 3, § 13. "Bills may originate in either house, but may be altered, amended, or rejected by the other; and on the final passage of all bills the vote shall be by ayes and noes, and shall be entered on the journal; and no bill shall become a law without the concurrence of a majority of all the members in each house." Id. § 21. "Every bill shall be read on three different days in each house, unless, in case of urgency, three-fourths of the house where such bill is so depending shall deem it expedient to dispense with this rule; and every bill, having passed both houses, shall be signed by the speakers of their respective houses; and no private or local law which may be passed by the general assembly shall embrace more than one subject, and that shall be expressed in the title." Id. § 23. It is contended that the general assembly, in passing the Lake Front act, did not meet these requirements, and consequently that the act never became a law. The claim is that the bill was not read on three different days in each house, and that its subject is not expressed in the title. The facts upon which this claim rests will now be stated.

On the 13th of January, 1869, a bill was introduced into the house entitled "An act to enable the city of Chicago to enlarge its harbor, and to grant and to cede all the rights, title, and interest of the state in and to certain lands of the state, lying on and adjacent to the shore of Lake Michigan on the eastern frontage of said city." This bill expresses a desire that the harbor be enlarged, and commerce and navigation on the lake promoted, by the construction of docks, piers, breakwaters, and other works, according to such plans as might be made by the secretary of war. To that end it granted and ceded *to the city* all the right, title, and interest of the state in and to the submerged lands constituting the bottom of Lake Michigan, lying on the eastern front of the city, for the space of one league eastwardly from the shore-line; such grant and cession being upon the express condition that the city should not, on any account, alien, sell, or convey the said lands, but hold them in trust forever for the uses and purposes above stated; with the privilege, however, of leasing the same for a period not exceeding 99 years at any one time, upon the same terms as the school lands belonging to the city. The bill also granted and ceded to the city all the right, title, and interest of the state in and to the lands and grounds between the east line of Michigan

avenue and the track of the Illinois Central Railroad, whether the same be submerged or not, constituting a part of sections 10 and 15, in township 39, range 14 E. of the third P. M., or lying or being adjacent thereto on the east. This grant was subject to various conditions, among which were that the premises should not be conveyed or leased except upon the votes of three-fourths of the aldermen required to be elected, and that the city, at its election, might dedicate the whole or part of the premises for a public park. On the day of its introduction, this bill was read a first time, and ordered to be read a second time. The same day "the rule was dispensed with," the bill read a second time, and referred to a committee. On the 4th of February, 1869, the committee reported it back with amendments, recommending its passage as amended. The house adopted other amendments; and on the 10th of February, 1869, the report, as amended by the house, was adopted. On the same day the bill was ordered to be engrossed for a third reading. It was read a third time on the 20th of February, and passed. On the same day, *immediately after its passage*, it was ordered by the house that the title be "A bill for an 'An act in relation to a portion of the submerged lands and Lake Park grounds lying on and adjacent to the shore of Lake Michigan, on the eastern frontage of the city of Chicago.'" The fact of the passage of the bill in the house was communicated to the senate on the day of its passage, and two days thereafter it was taken up, read a first time, "*ordered* to a second reading," and laid on the table to be printed. On the 1st of March, 1869, the committee to which the bill had been previously referred, reported it back, with a recommendation in favor of its passage. The report "was concurred in, and the bill ordered to a third reading." The bill was read a third time, and passed, with the foregoing title, on the 8th of March, 1869. It was vetoed by the governor, and on the 16th of April, 1869, passed each body, his objections to the contrary notwithstanding. It will be seen from this history of the act as it went through the legislature that nothing appears in the senate journal to show that the bill was in fact read a second time in that body. Is it essential to its validity that it should appear in the journal that the bill was "read on three different days in each house?" Does the mere silence of the senate journal as to whether the bill was in fact read a second time in that body, on some one of three different days, raise a conclusive presumption that it was not so read?

The earliest case in the supreme court of Illinois upon this general subject to which our attention has been called is *Spangler* v. *Jacoby*, 14 Ill. 297. The court there said: "In our opinion, it is clearly competent to show from the journals of either branch of the legislature that a particular act was not passed in the mode prescribed by the constitution, and thus defeat its operation. The constitution requires each house to keep a journal, and declared that certain facts made essential to the passage of a law shall be stated therein. If those facts are not set forth, the conclusion is that they did not transpire. The journal is made up under the immediate direction of the house, and is presumed to contain a full and complete history of its proceedings. If a certain act receive the

constitutional assent of the body, it will so appear on the face of the journal, and, when a contest arises as to whether an act was thus passed, the journal may be appealed to to settle it.    It is the evidence of the action of the house, and by it the act must stand or fall.    It certainly was not the intention of the framers of the constitution that the signatures of the speakers and executive should furnish conclusive evidence of the passage of a law.    The presumption, indeed, is that an act thus verified became a law pursuant to the requirements of the constitution; but that presumption may be overthrown.    If the journal is lost or destroyed, this presumption will sustain the law, for it will be contended that the proper entry was made in the journal; but when the journal is in existence, and it fails to show that the act was passed in the mode prescribed by the constitution, the presumption is overcome, and the act must fall." This decision is cited by counsel to support the proposition that the mere silence of the journal as to whether a bill was or not read on three different days—the journal not being lost or destroyed—is itself fatal to the validity of the act.    But we are not satisfied that the court intended to express an opinion upon that precise point.    Although it did not appear, in that case, that the bill was read the third time before it went to the senate, or that the ayes and noes were called, no special comment was made by the court upon the silence of the journal as to the bill not being read the third time.    Plainly, its language had reference to the fact that the journal did not show the passage of the bill by ayes and noes.    It was with reference to that fact that the language above quoted was used.    In *Turley* v. *County of Logan*, 17 Ill. 152, the court said that "the journals should show the readings, and the passage of the law by a constitutional vote;" but nothing was said as to what would be the result where the journal did not show that each of the required readings was had.    The general language above quoted seems to have been unnecessary to the decision, for the court finally sustained the validity of the act there in question, upon the ground that the same legislature, in extra session, caused its journals to be amended so as to show what, according to the minutes of the clerk of the house, was the fact,—that the bill had been read the required number of times.    That we do not misinterpret these decisions is shown in *Supervisors of Schuyler Co.* v. *People*, 25 Ill. 181, where one of the grounds of objection to an act was that the senate journal did not show that the bill was read three times before it was put on its final passage.    The court said: "The constitution does require that every bill shall be read three times in each branch of the general assembly before it shall be passed into a law; but the constitution does not say that these several readings *shall be entered on the journals*. Some acts performed in the passage of laws are required by the constitution to be entered on the journals, in order to make them valid, and among these are the entries of the ayes and nays on the final passage of every bill; and we held in the case of *Spangler* v. *Jacoby*, 14 Ill. 297, that, where the journal did not show *this*, the act never became a law.    But, where the constitution is silent as to whether a particular act which is required to be performed shall be entered on the journals, it is then left

to the discretion of either house to enter it or not; and *the silence of the journal on the subject ought not to be held to afford evidence that the act was not done.* In such a case we must presume it was done, unless the journal affirmatively shows that it was not done." This decision was expressly reaffirmed in *Railroad Co.* v. *Hughes*, 38 Ill. 186. Nothing to the contrary was decided in *People* v. *Starne*, 35 Ill. 141, or in *Ryan* v. *Lynch*, 68 Ill. 161, which is relied upon as modifying or overruling *Supervisors of Schuyler Co.* v. *People*. The case in 35 Ill. recognizes the doctrine of the *Schuyler Co. Case*, and goes upon the ground that the ayes and noes were not called, and spread upon the journals of the house, on the passage of the bill. In *Ryan* v. *Lynch* it appeared from the journal that the bill was read twice in the senate; but the journal was silent as to a third reading, and did not show any call of the ayes and noes on the final passage of the bill. The decision was that as the proceedings in the senate, certified by the secretary of state, were competent proof of the facts therein stated, the failure of the journal to show a call of the ayes and noes was fatal to the bill. Nothing was said as to the effect to be given to the mere silence of the senate journal as to the third reading of the bill. Indeed, we do not find that any of the numerous decisions of the state court relating to the passage of bills by the legislature have modified or overruled the doctrine announced in *Supervisors of Schuyler Co.* v. *People*. With that doctrine we are entirely satisfied. It is in harmony with the adjudications in many of the states whose constitutions have provisions similar to those in the constitution of Illinois which we have been considering. *Miller* v. *State*, 3 Ohio St. 475; *McCulloch* v. *State*, 11 Ind. 424; *State* v. *City of Hastings*, 24 Minn. 78; *English* v. *Oliver*, 28 Ark. 317; *Chicot Co.* v. *Davies*, 40 Ark. 200; *State* v. *Francis*, 26 Kan. 724; *In re Vanderberg*, 28 Kan. 243; *State* v. *Mead*, 71 Mo. 268. We therefore hold that the mere silence of the senate journal as to whether the act of 1869 was read the second time in that body does not justify us in holding it to be invalid.

The next inquiry, under this head, is whether the act of 1869 is a private or local law; if so, whether the title sufficiently expresses the subject thereof. In entering upon this inquiry, we lay out of view the eighth section of the act declaring it to be a public act; for the mere declaration of the legislature that it was a public act would not make it such, or preclude the determination of its character by the courts. *Railroad Co.* v. *Gregory*, 15 Ill. 28. On behalf of the railroad company, it is contended that the word "private" is used as contradistinguished from "public," and "local" as contradistinguished from "general;" that the act in question is both public and general, because it concerns the interests of the public at large, contains a grant of the public domain of the state, provides for a revenue to be applied for state purposes only, and has in view the improvement of a harbor, in which object as well the people of Chicago as of the entire country and of foreign countries are interested. We recognize the force of this argument. But, if it be sound, it would follow that every act, or at least the great body of acts, referring in any way to municipal corporations, and to railroads constructed and maintained un-

der legislative authority, must be taken out of the prohibition against the passage of a private or local law, whose subject is not expressed by its title; for all such acts may be said to relate to agencies employed by the state for the accomplishment of public purposes, and in which, in some sense, the people of the whole state are interested. Some light, we think, is thrown upon this question by the constitution of 1870, which does not contain any provision requiring the subject of a private or local law to be expressed in its title, but instead thereof prohibits the general assembly from passing "local or special laws" in certain enumerated cases, among which are laying out, opening, altering, and working roads or highways; vacating roads, town-plats, streets, alleys, and public grounds; locating or changing county-seats; regulating county and township affairs; regulating the practice in courts of justice; regulating the jurisdiction and duties of justices of the peace, police magistrates, and constables; providing for changes of venue in civil and criminal cases; incorporating cities, towns, or villages; providing for the management of common schools; the protection of game or fish; and chartering or licensing ferries or toll-bridges. The word "local," as used in the constitution of 1870, evidently means what it did in that of 1848; and we are of opinion that laws relating to any of these subjects would have been deemed "local," within the meaning of the constitution of 1848, when, by their terms, they were to have only a local territorial operation. In many of the states, the constitutional requirement is that every law, whether private or public, local or general, shall contain but one subject, which shall be expressed in the title. But the Illinois constitution of 1848 had in view only to guard against enactments of a private or local character, the subject whereof was not expressed in the title. If it were conceded, in this case, that the act of 1869 must, by reason of some of its provisions, be deemed a public act, within the rule requiring courts to take judicial notice of its contents, (*Binkert* v. *Jansen*, 94 Ill. 290,) the result would not follow for which counsel of the company contend; for the constitutional prohibition equally applies to legislation which is local in its character. In other words, an act may be of a public nature, and yet, by its terms, be local in its operation and immediate results. This act does not relate to the entire line of the railroad company within the state, nor to all the municipal corporations existing under her authority, but, among other things, to specified property in a particular city. It contains provisions which concerned the people within that municipality far more than the people of any other locality in the state. Obviously, the intention of the framers of the constitution was to protect local communities against enactments, of the subjects whereof they had no previous notice from the titles used by the promoters of such legislation. An act is local which specially concerns the property and rights of a portion of the people of the state, although its subject may be of a public nature, and although in its general operation the people of the entire state may, in some sense, have an interest. It is none the less a local act, within the meaning of the constitution, because some of its provisions, if embodied in a separate statute, might have made that

statute a general law. As we shall see further along, the city of Chicago had, when the act of 1869 was passed, certain property rights in lands within its corporate limits. In that property no other municipal corporation of the state had any direct interest. Of some of that property the act required the city to make sale to particular corporations, at a named price. If such an act be not local, it is difficult to conceive of one that would be of that character, within the meaning of the constitution.

The rules to guide us in solving the question whether the subject of an act is sufficiently expressed seem to be well established by numerous decisions of the supreme court of Illinois. In *Railroad Co.* v. *Gregory*, 15 Ill. 20, it was said that the provision of the constitution must receive "a fair and reasonable construction,—one which will repress the evil designed to be guarded against, but which at the same time will not render it oppressive or impracticable." In *City of Ottawa* v. *People*, 48 Ill. 233, that, while the subject must be expressed, "the adjuncts to that subject, or the *modus operandi*, need not be." In *Binz* v. *Weber*, 81 Ill. 288, that the question whether an act contains more than one subject is to be determined by the controlling purpose of the law; not by the various provisions made for carrying that purpose into effect. In *Johnson* v. *People*, 83 Ill. 431, that the constitution "does not require that the subject of the bill must be specifically and exactly expressed in the bill; hence we conclude that any expression in the title which calls attention to the subject of a bill, although in general terms, is all that is required." In *Blake* v. *People*, 109 Ill. 504, that the clause of the constitution under consideration has uniformly been "construed liberally in favor of the validity of enactments; and the fact that many things of a diverse nature are authorized or required to be done is unimportant, provided the doing of them may fairly be regarded as in furtherance of the general subject of the enactment." And in *Mix* v. *Railroad Co.*, 116 Ill. 502, 6 N. E. Rep. 42, that "it is sufficient that the act is fairly covered by its title. The constitution does not require that all the legal effects of an act, such as repeals by implication, should be expressly stated in the title. Such a thing would be utterly impracticable. The general rule is illustrated in numerous cases in the state court, to some of which it will be well to refer. In *Railroad Co.* v. *Gregory*, 15 Ill. 20, "An act to incorporate the Belleville and Illinoistown Railroad Company" was held to contain but one subject, although one of its provisions conferred upon a named city and county authority to subscribe to the stock of the company, and although another section authorized the company to unite with any other railroad then or thereafter to be constructed in the state. So was "An act to incorporate the Firemen's Benevolent Association, and for other purposes," which contained a provision requiring the agents of all foreign insurance companies doing business in Chicago to pay to the association 2 per cent. on the amount of all premiums received by such agents. *Association* v. *Lounsbury*, 21 Ill. 511. In *O'Leary* v. *County of Cook*, 28 Ill. 534, "An act to amend an act entitled 'An act to incorporate the Northwestern University,'" which contained a prohibition upon the sale of ardent sprits within a distance of four miles of the university,

was sustained; the court observing that "it was not the purpose of the constitution to deprive the legislature of any power necessary to enable them to make private legislation ample and abundant to accomplish its legitimate purpose, but the object was to prevent them from covertly embracing several distinct and foreign subjects in one act." In *Neifing* v. *Town of Pontiac*, 56 Ill. 172, "An act to extend the corporate powers of the town of Pontiac" was sustained, as embracing one subject, although it contained provisions both extending and restricting such corporate powers. "An act to amend the charter of the city of. Chicago" was held, in *Prescott* v. *City of Chicago*, 60 Ill. 121, to sufficiently cover, by its title, provisions extending the limits of the city, and providing for the improvement and regulation of certain parks. In *People* v. *Hydraulic Co.*, 115 Ill. 281, 3 N. E. Rep. 413, an act passed in 1853 was sustained as embracing one subject; the title being "An act to amend an act incorporating the Hydraulic Company and the La Salle County Manufacturing Company of Ottawa, both incorporated under the general law approved February 10, 1849." The court said: "The subject of the act of 1853, therefore, was the amendment of the act of 1849, or of the act incorporating these two companies; and the additional powers conferred on the two companies were clearly germane to the amendment of the charter. It can hardly be that this objection is founded on the fact that the legislature has, by a single act, conferred certain powers and privileges on two distinct corporate bodies. It would be just as reasonable to say that the legislature, by reason of the constitutional provision in question, could not make a joint grant to two separate persons; and no one, we presume, would contend that for a moment." The decisions of the supreme court of the United States, interpreting the constitution of Illinois, and construing the constitutions of other states having provisions similar to those found in the constitution of Illinois of 1848, are to the same effect. *Woodson* v. *Murdock*, 22 Wall. 351, 373; *San Antonio* v. *Mehaffy*, 96 U. S. 315; *Unity* v. *Burrage*, 103 U. S. 447; *Louisiana* v. *Pilsbury*, 105 U. S. 278, 289; *Montclair* v. *Ramsdell*, 107 U. S, 147, 153, 155, 2 Sup. Ct. Rep. 391; *Jonesboro' City* v. *Railroad Co.*, 110 U. S. 192, 199, 200, 4 Sup. Ct. Rep. 67; *Otoe Co.* v. *Baldwin*, 111 U. S. 1, 4 Sup. Ct. Rep. 265; *School-Dist.* v. *Hall*, 113 U. S. 135, 5 Sup. Ct. Rep. 371; *Mahomet* v. *Quackenbush*, 117 U. S. 508, 6 Sup. Ct. Rep. 858; *Carter Co.* v. *Sinton*, 120 U. S. 517, 7 Sup. Ct. Rep. 650.

Applying these principles to the act of 1869, we are satisfied that it embraces one subject only, namely, the disposal of lands or grounds lying on and adjacent to the shore of Lake Michigan on the east front of the city of Chicago. Every clause and section of the act relate to that general subject. The title gives notice that the act relates.to that subject, and therefore was information to all that the act was to deal with it. What disposition was to be made of the lands and grounds referred to in the title appears from the body of the act.

It is insisted, however, that the effect of the act is, by implication, to enlarge the corporate powers of the Illinois Central Railroad Company, by permitting it to become, for all practical purposes, a wharf or dock

company. If this be true, as we think it is, it does not follow that the title fails to express the subject of the act. Whether the submerged lands and Lake Park grounds were to be held, owned, or managed by individuals, or by some municipal or railroad corporation, are matters of detail, which, according to the decisions of the state court, the legislature was not required to express in the title. It was only required to express the subject to which the act related. So far, then, as the act deals with the subject expressed in the title, it is capable of being enforced, without violating the constitutional provision under consideration.

Some doubt arose, on the argument, as to whether the first part of section 3, and sections 4, 5 and 6, did not embrace subjects that were unexpressed in the title. The title refers "to submerged lands and Lake Park grounds." The railroad company in 1869 occupied, used, and controlled grounds north of Randolph street, which never constituted part of Lake Park grounds, nor were they at that time submerged lands. And the same observation may be made as to the "public grounds" on the shore, east of Michigan avenue, and between Madison and Randolph streets. Hence it was argued that the above sections embraced subjects —that is, lands not submerged, nor part of Lake Park grounds—which are unexpressed in the title. On the other hand, it may be fairly, and we think properly, contended that the general subject, expressed in the title, is lands or grounds "lying on and adjacent to the shore of the lake, on the eastern frontage of the city of Chicago;" that all the lands or grounds described in the body of the act, whether submerged or not, are covered by that description; that the legislature, in referring to submerged lands, may have intended to describe them as they were when fractional sections 10 and 15 were subdivided and platted; and that to limit the general description by a literal interpretation of the words "submerged lands and Lake Park grounds" is inconsistent with the liberal construction which the supreme court of the state has always given to the constitutional provision in question. What was said by the supreme court of the United States in *Montclair* v. *Ramsdell*, 107 U. S. 147, 2 Sup. Ct. Rep. 391, may be here repeated, namely: That "the objection should be grave, and the conflict between the statute and the constitution palpable, before the judiciary should disregard a legislative enactment upon the sole ground that it embraced more than one object, or, if but one object, that it was not sufficiently expressed by the title."

It is also contended that no act could, under the constitution, become a law, unless it bore, during the whole period of its pendency in and passage through *each* branch of the legislature, an appropriate title; that is, a title which sufficiently expressed the subject of the act. It will be remembered that the bill, when first introduced, bore the title of "An act to enable the city of Chicago to enlarge its harbor, and to grant and to cede all the rights, title, and interest of the state in and to certain lands lying on and adjacent to the shore of Lake Michigan on the eastern frontage of said city." According to the house journal, the bill, after the second reading, was referred to a committee, which subsequently reported

it back with an amendment which, in effect, was a substitute for the senate bill, except the title. The substitute was adopted. The bill as amended was read a third time, and passed; the present title being adopted *after the passage* of the bill in the house. If we do not misunderstand the point here made, it is that even if the present title sufficiently expressed the subject of the bill, *as it finally passed both branches of the legislature*, the title which the bill had at the time of its several readings in and passage *by the house* did not express the subject of the act as it finally passed over the veto of the governor. In support of this proposition, we are referred to *Binz* v. *Weber*, 81 Ill. 288, in which the court said that, by giving effect to the constitutional provision under examination, "no portion of a bill not germane to its general object, or not expressed in its general title when passed through the two houses, can acquire the force of a law. Only the portions of a bill expressed in the title when passed are constitutionally adopted. This being so, it does not matter what title might be adopted after its passage to designate a law. The title adopted after the passage of a bill is no part of the law, nor does it enlarge, limit, or control the law. The title to a bill is an essential part of a bill, and under the constitution every bill must have a title, and such title must truly state the object of the bill. Under this constitutional requirement, then, we must look to the title of this bill as it passed each house, and not to the title of the act after its adoption, to learn what portion of its provisions are constitutional. By thus applying these provisions to the passage of a law, we have no doubt we shall effectuate the intention of the framers of that instrument." In *Johnson* v. *People*, 83 Ill. 431, the court said: "In the case of *Binz* v. *Weber*, 81 Ill., in passing upon a similar provision of the constitution of 1848 applicable to private laws, we said that the validity of an act must depend, under such a provision, upon the title of the bill as it passed both houses, and not on the title of the law after its adoption. Is, then, the title by which the bill passed sufficient to sustain the law?" Having already determined that the present title of the act—which was the title before the bill was sent from the house, as well as when it passed the senate—sufficiently expressed the subject thereof, it is only necessary, under the decision of the state court, to inquire whether the subject of the act was sufficiently expressed by its title at the time it passed the house. That there is some difference between the original and substituted title must be conceded. But that difference is not so marked as to justify the court in sustaining the point under examination. The general subject of each title is "certain lands lying on and adjacent to the shore of Lake Michigan on the eastern frontage of the city of Chicago." The original title suggested the enlargement by the city of its harbor, and the cession of the rights, title, and interest of the state in the lands referred to. But to whom such cession was to be made was not distinctly indicated. The idea conveyed was that the lands described were to be used so as to enable the city to enlarge its harbor. Turning to the body of the act as it passed the house, we find that the lands therein disposed of are lands embraced within the description in the original title; the rights, title,

and interest of the state therein being granted and ceded. The only part of the original title which does not express anything to be found in the act are the words "to enable the city of Chicago to enlarge its harbor." But that difference is immaterial, for everything in the act is sufficiently expressed in the remainder of the title as it passed the house before the present title was substituted; that is, by the words "to grant and to cede all the rights, title, and interest of the state in and to certain lands lying on and adjacent to the shore of Lake Michigan on the eastern frontage of said city." Had these words constituted the title of the act as finally passed, we do not doubt it would have met the requirements of the constitution. If this be so, the act did not fail to become a law merely because the original title contained superfluous words.

Another objection to the act of 1869, based upon the local law, rests upon sections 1 and 2 of article 11 of the constitution of Illinois, adopted in 1870, which provide:

"Section 1. No corporation shall be created by special laws, or its charter extended, changed, or amended, except those for charitable, educational, penal, or reformatory purposes, which are to be and remain under the patronage and control of the state; but the general assembly shall provide, by general laws, for the organization of all corporations hereafter to be created.

"Sec. 2. All existing charters or grants of special or exclusive privileges under which organization shall not have taken place, or which shall not have been in operation within ten days from the time this constitution takes effect, shall thereafter have no validity or effect whatever."

These sections of the constitution took effect August 8, 1870. It is contended that neither at that time, nor within ten days thereafter, was there a valid or binding acceptance by the railroad company of the provisions of the act of 1869; consequently, it is argued, the act fell, so far as it gave the company the right to hold property which it was not previously entitled to hold for the purposes specified in its charter, and so far as it enlarged its corporate powers. The constitutional provisions just cited have no bearing upon the present case. The act of 1869 is not a "grant of special or exclusive privileges," within the meaning of those provisions. It is a grant of lands to a railroad corporation, to be used, part of them as passenger depot grounds, and part of them for the purpose of improving a harbor, and thereby promoting commerce and navigation upon public navigable waters. That the act had the effect to increase the corporate powers of an existing corporation, and enable it to engage in business not embraced in its original charter, does not bring the act within the operation of section 2 of article 11. Section 2 is to be interpreted in connection with section 1; and, so interpreted, it is clear that the framers of the constitution intended to strike down all corporations then existing which, within 10 days after that instrument took effect, were still unorganized, or were not in operation as corporations. There was no purpose to take away any additional special or exclusive privileges granted to corporations, organized and in actual operation, as was the Illinois Central Railroad Company, at the time the constitution

was submitted to the popular vote, or to interfere with any grant of land made by the state before that date.

An argument much pressed in behalf of the state and the city is that a mere legislative grant of lands cannot be made effectual for any purpose; since by section 25, art. 4, Const. 1848, "all grants and commissions shall be sealed with the great seal of the state, signed by the governor, or person administering the government, and countersigned by the secretary of state." The contention is that the issuing of a completed patent was necessary to vest the title; and whether it should even issue even after the legislature had expressed the intention of parting with the state's title was, under the constitution, for the governor to determine; and that until that determination was evidenced by a grant signed by him, or by the person administering the government, and sealed with the great seal of the state, no title passed. A similar question arose in *Rutherford* v. *Greene's Heirs*, 2 Wheat. 196, 199. In 1780, the state of North Carolina passed an act reserving a certain tract of country for the officers and soldiers of the line of that state. In 1782, another act was passed for the relief of the officers and soldiers of the Continental line, the tenth section of which allotted and gave 25,000 acres of land to Maj. Gen. Nathaniel Greene, his heirs and assigns, within the bounds reserved for the use of the army, to be laid off by commissioners, as a mark of the high sense which North Carolina entertained "of the extraordinary services of that brave and gallant officer." In opposition to the title of Greene's heirs, it was contended that the legislative enactment was ineffectual as a grant, under the provision of the constitution of that state which declared "that there shall be a seal of this state, which shall be kept by the governor, and used by him as occasion may require; and shall be called the 'Great Seal of the State of North Carolina,' and be affixed to all grants and commissions." Chief Justice MARSHALL, speaking for the whole court, said: "This legislative act, it is said, cannot amount to a grant, since it wants a formality required by the constitution. This provision is so obviously intended for the completion and authentication of an instrument attesting a title previously created by law—which instrument is obviously the mere evidence of prior legal appropriation, and not the act of original appropriation itself—that the court would certainly have thought it unnecessary to advert to it had not the argument been urged repeatedly, and with much earnestness, by counsel of the highest respectability." The court held that the act of the legislature vested a title in Gen. Greene to 25,000 acres; and that the survey thereof, made pursuant to the statute, gave precision to that title, and attached it to the land. This case was referred to with approval in *Fremont* v. *U. S.*, 17 How. 542, 559. We are of opinion that whatever may be the scope of the provision of the state constitution declaring that all "grants" shall be sealed with the great seal of the state, and signed by the governor, or the person administering the government, it was not intended to withhold from the legislature the power, by statute, to pass a complete legal title to lands belonging to the state.

Other objections to the act of 1869, founded on specific provisions of the state constitution, are made. Some of them are not deemed of sufficient gravity to require special notice, while, in respect to others, the conclusion reached upon the points examined renders it unnecessary to consider them.

Proceeding, then, to the examination of questions involving the construction of the Lake Front act of 1869, and the effect of the repealing act of 1873, we observe that the third section of the act of 1869 *confirms* "the right of the Illinois Central Railroad Company under the grant from the state in its charter, * * * and under and by virtue of its appropriation, occupancy, use, and control, and the riparian ownership incident to such grant, appropriation, occupancy, use, and control in and to the lands, submerged or otherwise, lying east of the said line, running parallel with and 400 feet east of the west line of Michigan avenue in fractional sections 10 and 15." This confirmation covers all that was done by the railroad company prior to April 16, 1869, in the way of filling in the lake, and constructing wharves, slips, piers, tracks, warehouses, etc., between Chicago river and the north line of Randolph street. It also covers the occupancy and use by it for way-ground of the two triangular pieces of ground immediately south of Randolph street. We have already expressed the opinion that what was done in these respects by the railroad company was to be justified by its riparian ownership, by its charter, and by the city ordinances of 1855 and 1856. If, however, we should be in error in so holding, its is clear that its action, in the particulars just stated, was legalized by the confirmatory clause of section 3 of the act of 1869. If what was done by the railroad company prior to April 16, 1869, in the localities discussed in that clause, had been done under legislative authority previously conferred, the company would undoubtedly have acquired thereby property rights that could not have been taken from it except upon compensation. But subsequent legislative ratification or confirmation of what was done is equivalent to original authority. *Grenada Co. Sup'rs* v. *Brogden*, 112 U. S. 271, 5 Sup. Ct. Rep. 125; *Anderson* v. *Santa Anna*, 116 U. S. 364, 6 Sup. Ct. Rep. 413. This being so, it was beyond the power of the state, consistently with the constitution of Illinois, or the constitution of the United States, to revoke that confirmation, as was attempted to be done by the repealing act of 1873. But the most important provision in the act of 1869 is the one granting in fee to the Illinois Central Railroad Company, its successors and assigns, all the right and title of the state in and to the submerged lands on the east front of the city of Chicago, constituting the bed of Lake Michigan, and lying east of the breakwater of the company, for the distance of one mile, and between the south line of the south pier [near Chicago river] extended eastwardly and a line extended eastward from the south line of lot 21, south of and near to the round-house and machine-shops of said company. This and other grants to the Illinois Central Railroad Company in the act of 1869 were declared therein to be upon the express condition that the company shall "perpetually pay into the treasury of the state the per centum on the gross or total proceeds,

receipts, or income derived from said road and branches stipulated in its charter, and also the per centum on the gross receipts of said company reserved in this act."

What was the effect of the repealing act of 1873 upon the grant of submerged lands? It is contended by the railroad company that the repealing act of 1873 is inoperative and void, for the reason, among others, that its provisions are repugnant to that clause of the constitution of Illinois, in force at the time of the passage of the act of 1869, which provides that "no contract, obligation, or liability of the Illinois Central Railroad Company to pay any money into the state treasury, nor any lien of the state upon or right to tax property of said company, in accordance with the provisions of the charter of said company, approved February 10, in the year of our Lord 1851, shall be released, suspended, modified, altered, remitted, or in any manner diminished or impaired by legislative or other authority." The repeal of the act of 1869 does not purport to release, suspend, modify, alter, remit, diminish, or impair any contract, obligation, or liability of the company, or any lien of the state, or any right of the state to tax the property, arising *under the company's charter of* 1851. Consequently the repeal is not in violation of the constitutional provision referred to. The company also insists that it was beyond the power of the legislature to withdraw this grant, especially after the company's acceptance of the act of 1869, and after it had incurred, as it claims to have done, large expenditures, upon the faith that the provisions of said act would be respected by the state and the city. Upon a careful consideration of all that has been said upon this important and difficult question, the court is of opinion that, as respects the submerged lands constituting the bed of the lake, and expressly granted by the third section of the act of 1869, the repealing act of 1873 did not infringe any legal right of the company, and was a valid exercise of legislative power.

It is clear that, in respect to these submerged lands, the act of 1869 imposed upon the company no duty or obligation that was enforceable by legal proceedings. The act was passed before the general government had, in the interest of commerce, adopted any plan for an outer harbor at the city of Chicago. And we agree with one of the learned counsel of the railroad company when he says that, looking at the terms of the grant, the nature and situation of the land granted, and all the attendant circumstances of which the court may properly take cognizance, it is manifest that the intention of the legislature was to enable that company, in the interest of commerce, and therefore for public purposes, to construct an outer harbor at Chicago, and to invest it with power to build, maintain, and lease wharves and docks for the use of shipping. The ownership of the soil under the lake would have been of no practical value to the railroad company for any purpose, except those just stated. A trust was ingrafted upon the fee in the submerged lands for the benefit of the public, and not for the aggrandizement of the railroad company. This interpretation of the act is fortified by the prohibition upon the company's granting, selling, or conveying the fee,—a restriction upon

its power of dealing with these lands inconsistent with an absolute title thereto. It is further sustained by the declaration that nothing in the act should authorize obstructions to the harbor, or the impairment of the public right of navigation; and by the reservation of the right of the general assembly to regulate "the rates of wharfage and dockage to be charged in said harbor." In short, the legislature intended by the act of 1869 to secure such improvement of the harbor of Chicago as was demanded by the large commerce of the lake, and to that end proposed to place certain resources of the state at the command of the railroad company, as an agency of the state, with such an enlargement of its powers and privileges as would enable it to accomplish the public objects in view. Whether the railroad company in due time, and in a legal mode, accepted the provisions of the statute, and whether any formal acceptance of those provisions upon its part was necessary, are questions elaborately discussed at the bar. Without determining either of those questions, we assume, for the purposes of this case, that such an acceptance was made, in proper form, and so as to invest the company with the power, not given in its original charter, of erecting and maintaining wharves, docks, and piers, in the interest of commerce, and beyond the necessities or legitimate purposes of its own business as a railroad corporation. We are nevertheless unable to perceive why it was not competent for the state, by subsequent legislation repealing the act of 1869, to withdraw these additional powers of the company, thereby restricting it to the business for which it was incorporated, and to resume control of the resources and property which it had placed at the command of the company for the improvement of the harbor. When the act of 1869 was passed, it was deemed best for the public interests that the improvement of that harbor should be effected by the instrumentality of a railroad corporation interested to some extent in the accomplishment of that result. But if the state subsequently determined upon considerations of public policy, that this great work should not be intrusted to any railroad corporation, and that a corporation should not be the owner of even a qualified fee in the soil under the navigable waters of the harbor, no provision of the national or state constitution forbade the general assembly of Illinois from giving effect, by legislation, to this change of policy. It cannot be claimed that the repeal of the act of 1869 took from the company a single right conferred upon it by its original charter. That act only granted additional powers and privileges for which the railroad company paid nothing, although, in consideration of the grant of such additional powers and privileges, it agreed to pay a certain per centum of the gross proceeds, receipts, and incomes which it *might* derive, either from the lands granted by the act, or from any improvements erected thereon. But it was not absolutely bound, by anything contained in the act, to make use of the submerged lands for the purposes contemplated by the legislature,—certainly not within any given time,—and could not have been called upon to pay such per centum until after the lands were used and improved, and income derived therefrom. The repeal of the act relieved the corporation from any obligation to pay the per centum referred to,

because it had the effect to take from it the property from which alone the contemplated income could be derived. So that the effect of the act of 1873 was only to remit the railroad company to the exercise of the powers, privileges, and franchises granted in its original charter, and withdraw from it the additional powers given by the act of 1869 for the accomplishment of certain public objects.

The only suggestion of weight against the validity of the repealing act of 1873 is to the effect that after the passage of the act of 1869, and before its repeal, the railroad company had made extensive and costly improvements upon the faith of the grant of the submerged lands, and that the repeal operates to take from it property interests without compensation being made. If the repealing act were attended by any such result, the court would not hesitate to hold that the company could not be deprived of the use of any structures erected or improvements made upon these lands on the faith of the act of 1869, except upon compensation being made to it. But, in fact, no such case is presented, in respect to the submerged lands granted by the third section of the act of 1869, except that an insignificant part of those lands, east of the company's breakwater of 1869, marked on Map C, "Built 1873," was reclaimed from the lake by filling in before the act of 1873 was passed. The structures erected after the passage of the act of 1869, and before its repeal, between Chicago river and Randolph street, and those south of Park row, were erected, as we have seen, either under the power conferred upon the company by its charter, or with the consent, express or implied, of the city, or in the exercise of its rights as riparian owner of lots or ground on the shore of the lake. Indeed, it is apparent, with the slight exception just stated, that no expenditures were incurred by the railroad company, prior to the repealing act of 1873, distinctly upon the faith of the grant of submerged lands in the third section of the act of 1869.

In support of the position that the legislature could not constitutionally recall this grant of submerged lands, counsel for the company confidently rely upon *Fletcher* v. *Peck*, 6 Cranch, 87. In that case, it was said, among other things: "The contract between Georgia and the purchasers was executed by the grant. A contract executed, as well as one which is executory, contains obligations binding on the parties. A grant, in its own nature, amounts to an extinguishment of the right of the grantor, and implies a contract not to reassert that right. A party is therefore always estopped by his own grant. Since, then, in fact, a grant is a contract executed, the obligation of which still continues, and since the constitution uses the general term 'contract,' without distinguishing between those which are executory and those which are executed, it must be construed to comprehend the latter as well as the former." This general language must be interpreted with reference to the facts and issues in the particular case in which it was used. The case of *Fletcher* v. *Peck* was this: A statute of Georgia directed certain portions of the vacant lands of that state to be sold to James Gunn and others, constituting the Georgia Company, at a named price. Upon the payment of $50,000 by the purchasers, the governor was required to is-

sue and sign a grant for the same, taking a mortgage to secure the balance, $200,000, payable at a designated time. The cash payment was made, and a grant was signed and issued by the company. The estate passed ultimately into the hands of a purchaser for a valuable consideration, without notice, and *thereafter* the legislature of Georgia repealed the original act outright. The question presented was whether such repeal could affect the vested rights *of that purchaser*. The court adjudged that the state was restrained, "either by general principles which are common to our free institutions, or by the particular provisions of the constitution of the United States, from passing a law whereby the estate of the plaintiff in the premises so purchased could be constitutionally and legally impaired and rendered null and void." Had the legislature of Georgia repealed the original act before the first purchaser made payment therefor, and before the governor had signed and issued the grant, and taken the required mortgage, the repeal would not have been open to the objection that it took away a vested estate acquired, under valid legislation, by a subsequent purchaser without notice. It is clear that the present case is not controlled by *Fletcher* v. *Peck*. The railroad company was not a purchaser of the submerged lands. It paid nothing for them. It only assumed to pay a certain per centum of any income that might be derived from the use of the lands, but it did not come under any enforceable obligation to use them. In short, it accepted the grant of the submerged lands with the knowledge that the only purpose of the state was to improve the harbor of Chicago by the construction and maintenance of wharves, docks, and piers in aid of commerce on the lake, but without assuming any obligation to make the improvements contemplated. The repeal of the act making the grant was therefore nothing more than a change of policy upon the part of the state, which took from the company no franchise or privilege, secured by its charter. The state, in effect, only revoked the license which had been granted to the company to improve the harbor of Chicago, and discharged it from every obligation it might have incurred by entering upon and completing that work.

Upon the whole case, we are of opinion that the effect of the repealing act of 1873 was to withdraw from the railroad company as well the grant of the submerged lands described in the third section of the act of 1869, as the additional powers therein conferred upon it, by implication, to engage in the business of constructing and maintaining wharves, piers, and docks for the benefit of commerce and navigation generally, and not in the prosecution of its business as defined and limited by its original charter; saving to the company the right to hold and use, as part of its way-ground, or right of way, the small part of the submerged lands, outside of its breakwater of 1869, between Monroe and Washington streets, extended eastwardly, which was reclaimed—presumably upon the faith of the act of 1869—from the lake in 1873, and is marked on Map C, "Built, 1873." Such repeal was attended with the further result that while the city of Chicago may, under its charter, preserve the harbor, prevent obstructions being placed therein, and make wharves and slips

at the ends of streets, the exercise of those powers, and the whole subject of the development or improvement of the harbor by a system of wharves, docks, piers, and other structures, is with the state, subject only to the paramount authority of the United States under the power of congress to regulate commerce.

Several important questions were made in reference to the grant in the fourth section of the act of 1869 to the Illinois Central Railroad Company, the Chicago, Burlington & Quincy Railroad Company, and the Michigan Central Railroad Company of all the right and title of the state in and to the lands, submerged or otherwise, lying north of the south line of Monroe street, and south of the south line of Randolph street, and between the east line of Michigan avenue and the track and roadway of the Illinois Central Railroad Company. But for the purpose of disposing of this branch of the case it is only necessary to say that construing sections 5 and 6 in connection with section 4, it is clear that this grant was upon condition that those railroad companies would pay to the city a named sum, in installments, and within a fixed time; and if the tender of the first installment, of $200,000, to the comptroller, was binding upon the city, the subsequent return of the money to the railroad companies, at their request, deprived them of whatever benefit accrued from that tender, leaving them in the attitude of never having performed the conditions upon which they were to acquire the title to those lands. So that the title remains just where it was before the passage of the act of 1869, namely, in the city of Chicago, in virtue of the recorded subdivision into lots, streets, and public grounds of fractional section 15, and of the S. W. ¼ of fractional section 10.

In the case of *U. S.* v. *Illinois Cent. R. Co.*, it may be said that, upon the demurrer which has been filed, the court can only take into consideration the allegations of the information, and such matters as are within its judicial knowledge. It cannot bring into that case, as now presented, facts which may have been proven in other cases. The demurrer is sustained, except as to that part of the information which alleges, in substance, that the Illinois Central Railroad Company claims the absolute ownership of, and threatens to take possession of, use, and occupy, the outer harbor of Chicago. It is the opinion of the court that the general government, upon the showing made by it, has no title to any of the streets or grounds described in said information, and has no standing in court, except so far as it seeks to protect the said harbor against obstructions that would impair the public right of navigation, or interfere with any plan devised by the United States for the development or improvement of the harbor.

What has been said is sufficient to dispose of all the questions in these causes which, in the judgment of the court, it is necessary to decide. Counsel will prepare and submit to the court such orders or decrees as will be in conformity with the foregoing views.

BLODGETT, J., (*dissenting*.) I fully concur in all the conclusions reached by the learned circuit justice in this case, except the finding that the city

is vested with the fee in the way-ground between the south line of sec-
tion 15, and the north line of Randolph street, subject to the right of oc-
cupancy and user by the Illinois Central Railroad Company, pursuant
to the three ordinances of the city referred to; as it seems to me quite
clear that the fee of this strip of land, 200 feet wide, is in the state of
Illinois, subject to the grant of perpetual user, for the purposes of a rail-
road, by virtue of the railroad company's charter of 1851, and the con-
sent to such use by these city ordinances.    We agree that the fee of the
land covered by the waters of Lake Michigan was in the state at the time
the charter of the Illinois Central Railroad was passed; and that this
way-ground was at that time a part of this submerged land, of which the
state so held the fee.    The charter of the company granted it the right
to enter upon, take possession of, and use all and singular any lands,
streams, and materials of every kind necessary for the location, construc-
tion, and maintenance of its road, with stations, turn-outs, side tracks,
depots, shops, etc.; and all such lands, waters, materials, and privileges
belonging to the state were granted to said corporation for said purposes.
And under this grant the railroad company had the right to take and use
this strip of submerged land, subject only to the consent of the city of
Chicago.    The city gave such consent by its ordinance of June 14, 1852;
so that at that time the fee of this strip was in this state, subject to the
right of use for railroad purposes granted to the railroad company.    Since
the company took possession under its charter, and the city ordinance of
June, 1852, of this strip of way-ground, it has filled it up so that it is
now solid land, and the city has filled up and reclaimed all the land
lying between the west line of the way-ground and the shore-line; but I
cannot see how this filling up has operated to clothe the city with the fee
to this way-ground, or to transfer the fee from the state to the city.    By
filling in and reclaiming the ground between the shore-line and the west
boundary of the way-ground, the city, as riparian owner, probably has
acquired the fee to the ground it has so filled up and reclaimed.    The
ordinance of June 14, 1852, evidently contemplated the construction of
an outer harbor, and reserved the right of access to such harbor by the
streets of the city; and perhaps the city may have the right, under
its charter from the state, to construct wharves and docks at the ends of
these streets.    But this does not put the fee in the way-ground in the
city, and at most only gives the city the right to pass across the way-
ground for the purposes of constructing, maintaining, and using these
improvements.    The city, as riparian owner of this frontage on the lake,
from the south line of section 15 to Randolph street, consented to the
taking of this strip of submerged land by the railroad company under
its grant from the state, and thereby consented to the carving out of this
strip of land from the city's riparian right; therefore, by the act of the
state and the city, this strip of way-ground has become dedicated to the
use of the railroad as a right of way to the full extent of such dedication.
I do not intend to be understood as indicating that the railroad company
has any title by the grant of the state, or the city ordinances, to any of
the submerged lands east of this way-ground, or that the city has parted

with its riparian rights to such submerged land east of this strip of way-ground. I do not deem this question, as to where the fee of the way-ground at present rests, at all material to the disposition of the cases now before us, as I fully concur in all the findings which bear upon the disposition of the cases in hand; but this question of the fee in the way-ground, which now seems to me purely speculative, may become material hereafter, and hence I prefer to put on record this memorandum of dissent upon this single point.