SiNNOtt, Judge,
delivered the opinion of the court:
This is a suit for the recovery of the sum of $30,370.94 which the plaintiff claims is the difference between the amount certified by the Postmaster General for transportation of various classes of mails of the United States between ports of the United States and the Canal Zone during the period December, 1925, to June, 1926, and the amount allowed and paid by the General Accounting Office for said services. As had been done prior to December 1, 1925, by the Postmaster General, the amount certified for said services was based upon the compensation or rates prescribed by him as being applicable for the transportation of mails by American vessels between the United States and a foreign port.
The General Accounting Office concluded that the rate payable for said services for the period involved was that applying to ocean transit of United States mail or foreign closed mail between the United States and its possessions, which was to be fixed by contractual agreement in accordance *684 with law. In the absence of a contract covering such services the General Accounting Office held that the plaintiff was entitled to a reasonable compensation which was determined by comparison with compensation being paid under contracts for transportation of mail between the United States and its insular possessions. This amount is $30,370.94 less than the compensation certified by the Postmaster General.
The sole question presented by the agreed statement of facts in this case is whether for the transportation of mails between ports of the United States and the ports in the Panama Canal Zone during the period December, 1925, to June, 1926, the plaintiff is entitled to be paid at rates applicable to the transportation of mails between the United States and a foreign port.
The authority to pay the rates contended for by the plaintiff is found in section 4009 of the Revised Statutes, which is as follows:
“ For transporting the mail between the United States and any foreign port, or between ports of the United States touching at a foreign port, the Postmaster General may allow as compensation, if by a United States steamship, any sum not exceeding the sea and United States inland postage; and if by a foreign 'steamship or by a sailing vessel, any sum not exceeding the sea postage, on the mail so transported.”
The question presented for decision is whether or not the ports within the Panama Canal Zone are foreign ports within the meaning of said section 4009 of the Revised Statutes.
Defendant’s very comprehensive and able brief refers in detail to the various pertinent acts of Congress, ';he treaty with Panama relating to the Canal Zone, and the Executive Orders of the President relating thereto, and gives the court a very clear elucidation thereof, of which we are glad to make copious use.
The President of the United States was authorized to acquire for and on behalf of the United States perpetual control of a strip of land extending from the Caribbean Sea to the Pacific Ocean, and the right to use the waters thereon, and to excavate, construct, and ferfePually to maintain,, operate, and protect thereon a canal, and jurisdiction over *685 said strip and the ports at the ends thereof, to make such police and sanitary rules and regulations as shall be necessary to preserve order and the public health thereon, and to establish such judicial tribunals as may be necessary to enforce such rules and regulations, and for that purpose there was created the Isthmian Canal Commission. (Act of June 28, 1902, c. 1302, 32 Stat. 481.)
Pursuant to the above authority a treaty between the United States and the Eepublic of Panama to insure the construction of a ship canal across the Isthmus of Panama to connect the Atlantic and Pacific Oceans was concluded and signed at Washington on the 18th day of November, 1903. This treaty was ratified, and proclaimed 'by the President of the United States on the 26th day of February, 1904. (Treaties and Acts of Congress Eelating to the Panama Canal, 1917.)
The parts of said treaty to be considered in the determination of this controversy are as follows:
“ARTICLE II
“ The Eepublic of Panama grants to the United States in perpetuity the use, occupation, and control of a zone of land and land under water for the construction, maintenance, operation, sanitation, and protection of said canal of the width of ten miles extending to the distance of five miles on each side of the center line of the route of the canal to be constructed ; the said zone beginning in the Caribbean Sea three marine miles from mean low-water mark and extending to and across the Isthmus of Panama into the Pacific Ocean to a distance of three marine miles from mean low-water mark with the proviso that the cities of Panama and Colon and the harbors adjacent to said cities, which are included within the boundaries of the zone above described, shall not be included within this grant. * * *
“Article III
“ The Eepublic of Panama grants to the United States all the rights, power, and authority within the zone mentioned and described in Article II of this agreement and within the limits of all auxiliary lands and waters mentioned and described in said Article II which the United States would possess and exercise if it were the sovereign of the territory *686 within which said lands and waters are located to the entire exclusion of the exercise by the Republic of Panama of any such sovereign rights, power, or authority.”
Subsequent to the ratification of the treaty with the Republic of Panama the President was authorized to take possession of and occupy on behalf of the United States the territory since known as the Canal Zone. (Act of April 28, 1904, c. 1758, 33 Stat. 429.) By section 2 of said act it was provided that until the expiration of the Fifty-eighth Congress, unless provision for the temporary government should sooner be made by the Congress, all military, civil, and judicial powers, as well as the power to make rules and regulations necessary for the government of the Canal Zone, and all rights, powers, and authority granted by the terms of the treaty between the United States and the Republic of Panama should be vested in such, person or persons and should be exercised in such manner as the President should direct for the government of said zone, and maintaining and protecting the inhabitants thereon in the free enjoyment of their liberty, property, and religion. Acting under the authority granted in said acts the President in his Executive order of May 9,1904, stated :
“ I have taken possession of and now occupy, on behalf of the United States, the Canal Zone and public land ceded by the Republic of Panama.
* * $ $ $ $ $
“ If there now be in force within the Canal Zone any franchise granting to any person or persons a privilege to maintain lotteries or hold lottery drawings or other gambling methods and devices of a character forbidden by the laws of the United States, or if the grantee of any such privilege has now the right to sell lottery tickets or similar devices to facilitate the business of the concessionaire, the commission shall enact laws annulling the privileges or concessions and punishing future exercise of the same by imprisonment or fine, or both.” (Panama Canal — Executive Orders, 1904r-1921, pp. 2.1, 25.)
Under authority of said Executive order, there was enacted by the Isthmian Canal Commission a code of laws for the government of the Canal Zone. (Laws of Canal Zone, 1904-1914, Annotated 1921; Code of Civil Procedure, Canal Zone, 1907.) Under said statutes and Executive orders the *687 commission exercised general governmental authority until March 31,1914, when it ceased to exist and was succeeded by the permanent organization authorized by the Panama Canal act. (Act of August 24, 1912, c. 390, 37 Stat. 560.) By section 2 of the latter act all laws, orders, regulations, and ordinances adopted and promulgated in the Canal Zone by order of the President for the government and sanitation of the zone and the construction of the canal were ratified and confirmed as valid and binding until Congress should otherwise provide.
At the time the act took effect there was a judicial establishment in the zone which had been set up under Act No. 1 of the Isthmian Canal Commission. By this act the judicial power of the government of the Canal Zone was vested in a supreme court, circuit courts, and municipal courts.
Prior to the passage of the Panama Canal act the government of the Canal Zone was wholly an executive matter. All powers, executive, legislative, and judicial, were vested in the President. He alone, or through those acting by his authority, made, amended, and repealed laws, created and abolished courts, appointed and removed officials, and generally exercised absolute power over the zone. By Executive order of April 2, 1907, the powers of the governor or chief executive of the zone were vested in the chairman of the commission. Upon completion of the canal this order was changed. Congress assumed the legislative power. While many matters were still left to be regulated by the President, by section 2 of the Panama Canal act the power formerly possessed by the President was abrogated. By section 4 of the act the President, when in his judgment the canal should be sufficiently advanced to render further services of the Canal Commission unnecessary, was authorized to discontinue the commission and complete, govern, and operate the canal and govern the Canal Zone, or cause them to be completed, governed, and operated through a governor and such other persons as he might deem competent to discharge the various duties connected with the completion, care, maintenance, sanitation, operation, government, and protection of the canal and Canal Zone. He was authorized to appoint, by and with the advice of the Senate, a governor at a salary *688 of $10,000 per annum. All other persons necessary for the completion, care, management, maintenance, sanitation, government, operation, and protection of the canal and Canal Zone were to be appointed by the President or by his authority, removable at his pleasure, and the compensation of such persons was to be fixed by him or by his authority, until Congress should by law regulate the same. (3T Stat. 561.)
By section 7 of the act, as amended by the act of September 21, 1922 (c. 370, 42 Stat. 1004), the authority of the governor was defined as follows:
“ That the Governor of the Panama Canal shall, in connection with the operation of such canal, have official control and jurisdiction over the Canal Zone and shall perform all duties in connection with the civil government of the Canal Zone, which is to be held, treated, and governed as an adjunct of such Panama Canal. Unless in this act otherwise provided, all existing laws of the Canal Zone referring to the civil governor or the civil administration of the Canal Zone shall be applicable to the Governor of the Panama Canal, who shall perform all such executive and administrative duties required by existing law.”
Under various provisions of the law now contained in Title 48 of the United States Code, the President is authorized to grant leases of public lands in the zone (section 1308); to make rules and regulations in matters of sanitation, health, and quarantine (section 1310); to make and change rules and regulations for levying, assessing, and collecting ad valorem, excise, license, and franchise taxes (section 1311); to make and enforce rules and regulations for the public roads and highways and for regulating, licensing, and taxing the use and operation of automobiles (section 1312); to make rules and regulations to assert and exercise the police power in connection with breaches of the peace or disorderly, indecent, or immoral conduct within the zone (section 1313); to make regulations for the operation of the canal and the locks and approaches thereto (section 1318); to provide a method for adjustment of claims arising out of personal injuries to employees (section 1320); to make rules and regulations touching the right of persons to enter or remain upon or pass over any part of the Canal Zone (section 1321); to erect, maintain, and operate radio communications, dry docks, repair shops, yards, docks, wharves, etc., and all *689 moneys received from such operations shall be subject to the provisions of existing law relating to the deposit of other public funds of the United States (section 1323) ; to determine what towns.shall exist in the Canal Zone and to subdivide said zone into subdivisions to be designated by name or number and to clearly define their boundaries (section 1341).
In the place of the courts created by the President, acting through the commission, Congress created and established courts and defined their jurisdiction. (Act of September 21, 1922, c. 370, section 1, 42 Stat. 1004.) The jurisdiction in admiralty is the same as is now exercised by the United States district judges and the United States district courts, and the practice and procedure in admiralty is the same as in the United States district courts. (Section 8, Panama Canal act, as amended by act of 1922, section 2,42 Stat. 1005.) The Circuit Court of Appeals of the Fifth Circuit has jurisdiction to review final judgments of the district courts in all cases in which the Constitution or any statute, treaty, title, right, or privilege of the United States is involved, and in cases in which the value in controversy exceeds $1,000; in felony cases, and in cases in which the jurisdiction of the trial court is in issue. (42 Stat. 1006; Theoktistou v. Panama Railroad Company, 6 Fed. (2d) 116.) Such appellate jurisdiction is subject to review by the Supreme Court of the United States, as in other cases, and is exercised by the Circuit Court of Appeals in the same manner as in reviewing final judgments of the district courts of the United States. The district judge, district attorney, and the marshal are appointed by the President by and with the advice of the Senate of the United States for a term of four years each, and until their successors are appointed and qualified. (42 Stat. 1006.)
In the various acts of Congress the Canal Zone has been referred to as “ Territory of the United States.” In the act relating to the liability of common carriers by railroad to their employees, it is provided:
“ That every common carrier by railroad in the Territories, the District of Columbia, the Panama Canal Zone, or other possessions of the United States shall be liable in damages *690 to any person suffering injury while he is employed by such carrier in any of said jurisdictions, * * (Act of April 22, 1908, c. 149, section 2, 85 Stat. 65.)
In the act known and referred to as the “White Slave Traffic Act,” it is provided “ That the term c Territory ’ as used in this act, shall include the district of Alaska, the insular possessions of the United States, and the Canal Zone.” (Act of June 25, 1910, c. 395, section 7, 36 Stat. 827.) In the act to provide for the opening, maintenance, protection, and operation of the Panama Canal, and the sanitation and government thereof, it was enacted:
“ That all laws and treaties relating to the extradition of persons accused of crime in force in the United States, * * * and all laws relating to the rendition of fugitives from justice as between the several States and Territories of the United States, shall extend to and be considered in force in the Canal Zone, and for such purposes and such purposes only the Canal Zone shall be considered and treated as an organized Territory of the United States.” (Act of August 24, 1912, c. 390, Section 12, 37 Stat. 569; U. S. Code, Title 48, section 1330.)
In the national defense act relating to the number of the National Guard of the United States, it was enacted that “ Provided further, That the word Territory as used in this act and in all laws relating to the land militia and National Guard shall include and apply to Hawaii, Alaska, Porto Pico, and the Canal Zone, * * *.” (Act of June 3, 1916, c. 134, section 62, 39 Stat. 198.) Congress has enacted that in defining terms the words “ The United States ” shall include the Canal Zone and all territory and waters, continental and insular, subject to the jurisdiction of the United States. (Act of March 4, 1917, c. 180, 39 Stat. 1193.) In section 1 of Title XIII, General Provisions, of the espionage act, it is enacted that the term “ United States ” as used in this act includes the Canal Zone and all territory and waters, continental or insular, subject to the jurisdiction of the United States. (Act of June 15, 1917, c. 30, 40 Stat. 231.) The words “United States,” as used herein, shall be deemed to mean all land and water, continental or insular, in any way within the jurisdiction of the United States or occupied by the military or naval forces thereof. (Act of October 6, *691 1917, c. 106,40 Stat. 412.) The words “ United States ” shall include the Canal Zone and all territory and waters, continental and insular, subject to the jurisdiction of the United States. (Act of April 20, 1918, c. 59, 40 Stat. 534.) The term “ United States ” as used in this act includes the Canal Zone and all territory and waters, continental or insular, subject to the jurisdiction of the United States. (Act of May 22,1918, c. 81, 40 Stat. 559.) The term “ United States ” includes any State, Territory, or District of the United States, the insular possessions, the Canal Zone, and all lands or waters subject to the. jurisdiction of the United States. (Act of July 18, 1918, c. 157, 40 Stat. 913.) The provisions ■of the national prohibition act were made applicable to the Canal Zone. (Act of October 28, 1919, c. 85, section 20, Title III, 41 Stat. 322.) In the act to regulate the entry of aliens into the United States, Congress provided: “ That the term 1 United States ’ as used in this act includes the Canal Zone, and all territory and waters, continental or insular, subject to the jurisdiction of the United States.” (Act of November 10, 1919, c. 104, section 3, 41 Stat. 354.)
By Executive order of December 5, 1912, the President of the United States by virtue of the authority vested in him by section 3 of the Panama Canal Act of 1912 (37 Stat. 561) declared all land and land under water within the limits of the Canal Zone to be necessary for the construction, etc., of the Panama Canal, and directed the Isthmian Canal Commission to take possession, on behalf of the United States, of all such land and land under water and to extinguish, by agreement when practicable, all claims and titles of adverse claimants to the occupancy thereof. (Panama Canal — Executive Orders 1904-1921, p. 132.) Subsequently, Congress passed an act removing a certain tract or lots of land situated in the town of Cristobal in said Canal Zone, and authorized the Panama Canal Eailroad Company to sell, transfer, and convey said lots or tracts of land with all improvements thereon to any person or persons or associations of persons and retain the consideration therefor for its own use. (Act of June 5, 1920, c. 231, 41 Stat. 948.) In the act relating to the landing and operation of submarine cables in the United States it is *692 provided, that the term “ United States ” as used in this act includes the Canal Zone, the Philippine Islands, and all territory, continental or insular, subject to the jurisdiction of the United States. (Act of May 27, 1921, c. 12, section 5, 42 Stat. 8.)
The plaintiff’s contention that “The Canal Zone is no part of the United States,” but that it is “ foreign ” within the meaning and intent of the laws of the United States, is not supported by the provisions of Articles II and III of the treaty between the United States and the Republic of Panama.
The treaty under which the United States acquired in perpetuity the use, occupation, and control of the Canal Zone, granted to and vested in the United States forever all the rights, power, and authority in and over said strip of land and lands under water which it could possess as the sovereign thereof to the entire' exclusion of the exercise of any such sovereign rights, powers, and authority thereover by the Republic of Panama.
A grant, as used in a treaty, comprehends not only those concessions which are made in form but also any concession, warrant, order, or permission to survey, possess, or settle, whether evidenced by writing or parol, or presumed from possession. (Strother v. Lucas, 12 Pet. 410, 435; Bryan v. Kennett, 113 U. S. 179, 192.)
A grant in its own nature amounts to an extinguishment of the rights of the grantor, and implies a contract not to reassert those rights. (State of Illinois v. Illinois Central Railroad Company, 33 Fed. 730-774.)
In all governments of constitutional limitations sovereign power is manifested in three ways: (1) By exercising the right of taxation; (2) by exercising the right of eminent domain; (3) through its police powers. It has been shown that all of these powers have been exercised by the executive and legislative branches of the Federal Government, and the question of whether or not the Canal Zone is a possession of the United States has been definitely determined and the courts are bound by that determination.
*693 Sovereignty is a political question. In Jones v. United States, 137 U. S. 212, it is said that the question of “ who is the sovereign, de jure or de facto, of a territory is not a judicial but a political question, the determination of which by •the legislative and executive departments of any government conclusively binds the judges, as well as all other officers, citizens, and subjects of that government. This principle has always been upheld by this court, and has been affirmed under a great variety of circumstances.” (See also Pearcy v. Stranahan, 205 U. S. 265, 273.)
The plaintiff also contends that because certain officers of the United States have for a long time considered and treated the Canal Zone as “ foreign ” that construction should not now be disturbed. In answer to this contention, we think it sufficient to say that the fact that certain officials of the United States have dealt with the Canal Zone on a basis which does not recognize it as a possession of the United States and treat it as anything but a possession of the United States is not conclusive of its status as a territorial possession of the United States. It is true that beginning with the decision in Downes v. Bidwell, 182 U. S. 244, the Supreme Court has drawn a distinction in the application of the Constitution and Federal statutes between the organized territory of the United States and its possessions, and has in effect held that the Constitution and general statutes may not apply to its “ possessions,” or that they have a different application to its “ possessions ” than they have to the “ territory of the United States.” Consequently, various statutes, the enforcement of which is particularly within the jurisdiction of certain officers, may be so construed as in effect to treat a “ possession of the United States ” on the basis of “ foreign ” territory merely because it is neither affirmatively or impliedly included in the particular statute, or statutes may be properly enacted which effectively deal with such possessions on a distinctly different basis from that of the United States or of its territory. It can not be conceded, however, that these circumstances necessarily establish that the Canal Zone is not a possession of the United States, because, as has already been pointed out, Congress has *694 enacted various statutes specifically applicable to the Canal Zone and which deal with it as a “ possession of the United States.”
There can be no question that the Canal Zone was acquired and is held by the United States under a perpetual grant which for all practical purposes conferred upon and vested in the United States all the rights, power, and authority of a sovereign, and that the United States has exercised full sovereign rights over the Canal Zone ever since the strip of land was acquired.
We think that it must be admitted that all doubt as to the character of the title of the United States in and to the Canal Zone has been conclusively removed by the decision of the Supreme Court in the case of Wilson v. Sham, 204 U. S. 24, where it was contended that the United States had no power to construct the Panama Canal because the Canal Zone was no part of the territory of the United States. Mr. Justice Brewer, speaking for the court (pp. 32 and 33), said:
“Another contention, in support of which plaintiff has presented a voluminous argument, is that the United States has no power to engage in the work of digging this canal. His first proposition is that the Canal Zone is no part of the territory of the United States, and that, therefore, the Government is powerless to do anything of the kind therein. Article 2 of the treaty, heretofore referred to, ‘ grants to the United States in perpetuity the use, occupation, and control of a zone of land and land under water for the construction, maintenance, operation, sanitation, and protection of said canal.’ By Article 3, Panama £ grants to the United States all the rights, power, and authority within the zone mentioned and described in article 2 of this agreement, * * * which the United States would possess and exercise if it were the sovereign of the territory within which said lands and waters are located, to the entire exclusion of the exercise by the Republic of Panama of any such sovereign rights, power, or authority.’
“ Other provisions of the treaty add to the grants named in these two articles further guaranties of exclusive rights of the United States in the construction and maintenance of the canal. It is hypercritical to contend that the title of the United States is imperfect, and that the territory described does not belong to this Nation, because of the omission of some of the technical terms used in ordinary conveyances of real estate.” (Italics ours.)
*695 It is clear from what has been before stated tbat the Canal Zone under the treaty with the Republic of Panama became and is a possession of the United States, which has always exercised and is now exercising all the powers and rights of sovereignty in the Canal Zone as are being exercised in all of the territory or possessions which are under the control and jurisdiction of the United States, and that ever since it was acquired the Canal Zone has been considered and treated by the legislative branch of the Government as a possession of the United States, and that therefore the Postmaster General was not authorized to pay compensation based upon rates applicable to transportation of mails between the United States and a foreign port, under section 4009, supra, of the Revised Statutes.
The plaintiff further contends that because the Postmaster General for a long time prior to December 1, 1925, had construed section 4009, Revised Statutes, as giving him authority to pay for the transportation of mails between the United States and the Canal Zone the same compensation provided for in said statute for the transportation of mails between the United States and a foreign port, such construction should not now be disturbed, “especially when so to do would savor of bad faith and a violation of contract rights.” We think the answer to this contention is that an unauthorized and illegal practice prevailing among officers of the Government, no matter how long continued, can never ripen into a binding usage. (Pierce v. United States, 1 C. Cls. 270; The Floyd Acceptances, 7 Wall. 666.) In the case of Houghton v. Payne, 194 U. S. 88, it is stated (pp. 99-100) that—
“ * * * it is well settled that it is only where the language of the statute is ambiguous and susceptible of two reasonable interpretations that weight is given to the doctrine of contemporaneous construction. United States v. Graham, 110 U. S. 219; United States v. Finnell, 185 U. S. 236. Contemporaneous construction is a rule of interpretation, but it is not an absolute one. It does not preclude an inquiry by the courts as to the original correctness of such construction. A custom of the department, however long continued by successive officers, must yield to the positive language of the statute.”
*696 Section 4009 of the Revised Statutes was amended by the act of July 3, 1926. (44 Stat. 900.) Plaintiff contends that the above act, amending1 section 4009, Revised Statutes, should be construed as a declaratory statute, making clear the meaning of section 4009, Revised Statutes. In other words, that the amendatory act was retroactive. It is well settled that statutes are not to be given a retroactive effect unless the legislative purpose so to do plainly appears. United States v. Magnolia Petroleum Company, decided February 20, 1928, 276 U. S. 160, wherein the court said:
“ Statutes are not to be given retroactive effect or construed to change the status of claims fixed in accordance with earlier provisions unless the legislative purpose so to do plainly appears.”
Also in White v. United States, 191 U. S. 545, wherein it is said:
“ Where it is claimed that a law is to have a retrospective operation, such must be clearly the intention, evidenced in the law and its purposes, or the court will presume that the lawmaking power is acting for the future only and not for the past; that it is enacting a rule of conduct which shall control the future rights and dealings of men rather than review and affix new obligations to that which has been done in the past.”
We can not accept the explanation that the act of July 3, 1926, sufra, amending section 4009 of the Revised Statutes, was an elucidation of said section, and not an addition to it, as claimed by plaintiff, but we regard it as a declaration of a new purpose and not the explanation of an old one. Our view is that the amendatory act makes specific provision for the casus omissus in said section 4009, Revised Statutes. See Smietanka v. First Trust & Savgs. Bank, 257 U. S. 602; also Shwab v. Doyle, 258 U. S. 529.
Prior to July 3, 1926, the compensation for transporting the mail between the United States and its possessions was required to be fixed by contractual agreement. In the absence of such a contract entered into in accordance with statutory requirements, or any law specifically fixing the compensation for such service, it is evident that the only payment which may be authorized for the services is their *697 reasonable value. The plaintiff has not seen fit to offer any evidence to prove that the amount allowed and paid by the General Accounting Office for the services is not reasonable in comparison with the compensation fixed in contracts for a similar service. In the absence of proof that the services were worth more than has been paid therefor the plaintiff can not recover the amount claimed in this cause or any other sum.
It is therefore ordered and adjudged that plaintiff’s petition be dismissed.
GeeeN, Judge; Moss, Judge; Geaiiam, Judge; and Booth, Chief Justice, concur.